WILLIAM MOSHE, as Parent and Next Friend of Ashor Moshe, a Minor, *et al.*, Plaintiffs-Appellants, v. ANCHOR ORGANIZATION FOR HEALTH MAINTENANCE, Defendant-Appellee (David S. Kang *et al.*, Defendants).

First District (5th Division)   No. 1—88—0284

Opinion filed May 25, 1990.

James H. Canel, Ltd., of Chicago (James H. Canel and Patricia N. Hale, of counsel), for appellants.

Lord, Bissell & Brook, of Chicago (Harold L. Jacobson, Hugh C. Griffin, Diane I. Jennings, and Chad M. Castro, of counsel), for appellee.

PRESIDING JUSTICE COCCIA delivered the opinion of the court:

This is an appeal from the dismissal of a medical malpractice complaint against a health maintenance organization (HMO). The original complaint was filed on September 29, 1983, by William Moshe, on behalf of his minor son, Ashor Moshe, and by William and Farida Moshe, on their own behalf, against Ashor's physician, David S. Kang (hereafter Dr. Kang). The complaint was later amended to add as defendant four other doctors, Rush-Presbyterian-St. Luke's Hospital, and Anchor Organization for Health Maintenance (hereafter Anchor or Anchor HMO).

Anchor, a corporation organized under the Illinois Voluntary Health Services Plans Act (Health Plans Act) (Ill. Rev. Stat. 1987, ch. 32, par. 595 *et seq.*), was at all relevant times also certified as a health maintenance organization (HMO), pursuant to both State and Federal statutes. Anchor is affiliated with Rush-Presbyterian-St. Luke's Hospital (Rush-Presbyterian). Plaintiffs sought to hold Anchor liable for the alleged medical malpractice of Dr. Kang, a consultant specialist under contract with Anchor to provide medical services to its subscribers, and of other physicians who were direct Anchor employees. In response, Anchor moved to dismiss plaintiffs' complaint, as to it, on the ground that Anchor is statutorily immune from liability, pursuant to section 26 of the Health Plans Act (Ill. Rev. Stat. 1981, ch. 32, par. 620). On January 14, 1988, following protracted discovery, the circuit court of Cook County granted Anchor's motion. The court's order, dismissing all claims against Anchor with prejudice, also stated that there was no just cause to delay enforcement or appeal. (107 Ill. 2d R. 304(a).) Plaintiffs timely appealed Anchor's dismissal from the case. Proceedings against Rush-Presbyterian and the five doctors, who are not parties to this appeal, remain pending in the circuit court.

The record reveals that Ashor Moshe was born on January 12, 1978. When Ashor was six months old, Dr. Kang, then his private

physician, diagnosed Ashor as suffering from a genetic condition known as methylmalonic acidemia. Sometime after this diagnosis but prior to 1982, Ashor's father, through his employer, selected Anchor HMO as the source of primary medical care for his family. Dr. Kang, pursuant to his consulting agreement with Anchor, continued to provide medical care to Ashor for his methylmalonic acidemia, by his parents' request. However, under Anchor regulations, such care now required authorization by an Anchor primary care staff physician, a salaried employee of the health plan. The record also discloses that generally, a consultant physician, such as Dr. Kang, could hospitalize Anchor patients only with the prior approval of an Anchor staff physician or its medical director.

The lawsuit against Dr. Kang and the other defendants arose from events which took place in December 1982. As alleged in plaintiffs' third amended complaint, filed October 27, 1987, Ashor was brought to Dr. Kang on December 6, 1982, with signs and symptoms of infection. The complaint further alleges that, in light of the child's diagnosed condition of methylmalonic acidemia, Dr. Kang and Dr. Eduard Jung, Ashor's primary care staff physician at Anchor, knew or should have known that in the presence of infection, Ashor was particularly susceptible to developing severe ketoacidosis. On December 7, 1982, Ashor was found comatose and unresponsive, and was diagnosed as suffering from severe ketoacidosis after admittance to Rush-Presbyterian's pediatric intensive care unit. As a result of his illness, Ashor developed further complications and allegedly suffered brain damage and permanent disability.

Count I of the complaint charges that Drs. Kang and Jung were negligent in failing to diagnose acidosis on December 6, 1982, and in failing to hospitalize Ashor for observation and supportive therapy in order to prevent the onset of ketoacidosis. It further charges that Anchor created policies, procedures, and regulations which inhibited the ability of physicians to provide quality health care. *Inter alia*, it states that Anchor created disincentives to hospital admissions through a process of "utilization review," to determine whether admissions and the length of in-hospital stays were necessary and appropriate, and through restrictions on certain medical tests and services absent prior approval by Anchor personnel. Thus, plaintiffs alleged that Anchor, through the acts and omissions of Drs. Kang and Jung, and its own policies, had proximately caused minor plaintiff's injuries. Count II, brought by Ashor's parents, contains the same allegations against Drs. Kang and Jung, and Anchor, and requests damages for medical expenses and loss of society of their child. In count III, minor plaintiff

charges three other doctors, Anchor, and Rush-Presbyterian with negligence based upon the treatment he received at Rush-Presbyterian after being admitted there on December 7, 1982. Count IV, brought by the parents, mirrors the allegations of count III.

This appeal hinges entirely upon the application and effect of the Voluntary Health Services Plans Act (Health Plans Act) (Ill. Rev. Stat. 1987, ch. 32, par. 595 *et seq.*), originally enacted in 1951, and of a 1988 amendment to that statute. At all times relevant to proceedings in the circuit court, including the dates of the alleged malpractice, the filing dates of the original and amended complaints, and the date of the dismissal order, section 26 of the Voluntary Health Services Plans Act provided as follows:

"A health services plan corporation *shall not be liable* for injuries resulting from negligence, misfeasance, malfeasance, nonfeasance or malpractice on the part of any officer *or employee* of the corporation, *or on the part of any person,* organization, agency, or corporation *rendering health services* to the health services plan corporation's subscribers and beneficiaries." (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 32, par. 620.)

On May 23, 1986, Anchor filed, pursuant to section 2—619 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—619), a motion to dismiss the claims against it, on the ground that "Anchor is a health service plan corporation organized and chartered under the Voluntary Health Services Plans Act *** as well as the Health Maintenance Organization Act," and thus statutorily exempt from malpractice liability. Attached to the motion was the sworn affidavit of William Gold, then president of Anchor HMO, in which he stated that "as of 1982 and continuing until the present time, Anchor HMO has been a charitable not-for-profit health service plan corporation duly organized and chartered under the Voluntary Health Service [*sic*] Plan [*sic*] Act by the Director of Insurance of the State of Illinois." No other documentation was attached to the motion to dismiss. However, a copy of Anchor's charter as a Voluntary Health Services Plans corporation organized under the Health Plans Act, approved by the Illinois Director of Insurance on November 2, 1971, was attached to Anchor's later filed "Reply Brief in Support of Motion to Dismiss." This reply brief was subsequently incorporated into Anchor's "Amended Motion to Dismiss" plaintiff's third amended complaint, upon which the court ultimately ruled. Although the affidavit of Mr. Gold was later stricken, the trial judge finding it insufficient because it did not set out in detail the documents and records reviewed by Gold to support his statement (107 Ill. 2d R. 191(a)), Gold did indicate

in a later discovery deposition that he had reviewed the articles of incorporation and the Department of Insurance's triennial insurance audit of Anchor, required under the Health Plans Act, for the years 1982 to 1984. In ruling on the motion to dismiss, the trial court relied on Gold's deposition and the amended motion, with charter, as well as the discovery deposition of a former Anchor president and other pertinent Anchor documents, as discussed below.

Nathan Kramer, president of Anchor from 1971 to 1985, stated in his deposition that he had devised the original health care plan out of which Anchor HMO eventually grew. The genesis of Anchor, in 1971, was an agreement between the former Presbyterian-St. Luke's Medical Center and the union representing about one-third of the center's employees. In lieu of paying into the union's health and welfare fund, the medical center believed that it could provide a better health program than the union could. After a health care plan was devised, all union members were required to join the program, which was also offered to nonunion employees of Presbyterian-St. Luke's. Mr. Kramer, one of the original signatories to Anchor's Health Plans Act charter, identified his signature and the charter documents. He further stated that by 1977, Anchor had also been certified as an HMO under the Illinois Health Maintenance Organization Act (Ill. Rev. Stat. 1981, ch. 111½, par. 1401 *et seq.*) (Illinois HMO Act), and qualified under the Federal Health Maintenance Organizations Act of 1973 (42 U.S.C. §300e *et seq.* (1982)) (Federal HMO Act). Once federally qualified as an HMO, Anchor was able to market its program directly to employers in the Chicago area and present information to employees about the advantages of its health plan, particularly its affiliation with the medical center (by 1982, known as Rush-Presbyterian). As a result of this marketing activity and with the recruitment of more doctors and health professionals, Anchor was functioning by 1982 as a staff-model HMO with about 66,000 subscribers, most of whom were part of employer groups. When Kramer retired in 1985, the program had a total of 130,000 subscribers, of which Rush-Presbyterian employees represented only a "relatively small fraction." Approximately 90% to 95% of Anchor's income, according to Kramer, was derived from the premiums paid to Anchor by the public and private employers of its subscribers.

Mr. Kramer also stated in his deposition that throughout the period from 1977 to 1985, Anchor operated, on a daily basis, pursuant to all three statutes under which it was chartered, certified, or qualified. Specifically, with respect to the Health Plans Act, he stated that operating pursuant to the statute included ongoing compliance with the

following: (1) providing a comprehensive range of medical services, including those expressly enumerated therein; (2) issuing to all subscribers a "subscription certificate," including certain itemized information in a specified format, such certificate having been first approved by the Illinois Director of Insurance; (3) operating on a not-for-profit basis under the management of a corporate "board of trustees," at least 30% of whom are Illinois licensed physicians or dentists; (4) having a "medical director," appointed by the trustees, who is in "complete charge of and responsible for the medical and related scientific aspects of the corporation"; and (5) filing with the Director of Insurance an annual financial statement. (See Ill. Rev. Stat. 1981, ch. 32, pars. 596, 599, 607 through 609, 609.1 through 609.3, 609.8 through 609.10, 615, 621.) However, with respect to the marketing of Anchor HMO to employers and potential subscribers, Kramer stated that no distinction whatsoever was made between Anchor's status as a qualified HMO and as a Health Plans Act corporation. Potential subscribers were informed that Anchor was a "federally qualified HMO and a state certified HMO and incorporated under the Voluntary Health Services Plans Act."

Following Mr. Kramer's August 5, 1987, deposition, plaintiffs filed a request for Anchor to produce certain documents, among them copies of Anchor form contracts, in use during 1982, with staff and consulting physicians. Also produced was a copy of a subscriber certificate for the relevant time period. These documents are included in the record on appeal. A provision in the form contract entered into by Anchor and its primary care staff physicians defines Anchor as "[a]n Illinois Voluntary Health Services Plans Corporation having several plans and numerous subscribers and beneficiaries as patients." It further states that, as Anchor is "obligated to provide certain [m]edical services" to these patients, it has obtained "the services of the staff member to assist it in the discharge of its [m]edical services obligations." Also, by express terms of this agreement, Anchor provides its staff physicians with "professional liability (malpractice] coverage." Another form contract, used for physicians rendering services on an outpatient or consulting basis, states that Anchor agrees to pay these physicians for the services rendered thereunder "on an appointment basis and in a timely manner as requested by ANCHOR staff physicians." In another provision, the consulting physician "warrants that he/she has in effect during the term of the contract a professional liability insurance policy." This agreement further provides that "[t]he physician will exercise independent professional judgment and discretion in performing services to Anchor patients

and shall not be supervised as to detail."

Both the staff and consulting physician contracts include a "utilization review" clause, to the effect that the physician agrees to participate in any utilization review program developed by Anchor, including "current review of hospitalized patients by the ANCHOR Utilization Review Nurse." Mr. Kramer stated in his deposition that utilization review is a "universal practice," required under the Federal HMO Act, in order to avoid both underutilization and overutilization of in-hospital services. In terms of the hospitalization policy in effect in 1982, Kramer explained that hospital admissions by consultant physicians had to be approved by a primary care physician, with the exception of life-threatening medical emergencies. He further stated that, in practice, hospitalization was actually a "joint decision," whereby the consultant, after seeing the patient, generally discussed the case with the primary care physician and the two would jointly determine whether an admission was required. In many cases, where a consultant would admit a patient without the primary physician's approval, Anchor would subsequently pay the hospital costs, based on a case-by-case determination and often the degree of confidence that the staff physician placed in the consultant to make this decision.

The face sheet of the subscriber certificate issued to new Anchor subscribers (heads of families), describes defendant as "the Anchor Organization for Health Maintenance ('ANCHOR'), an Illinois Voluntary Health Services Plans Act Corporation." It further states that "Anchor is qualified under the Federal HMO Act of 1973 and certified under the State of Illinois HMO Act of 1974." In the first paragraph of the "General Provisions" section is the following statement:

"It is expressly understood that ANCHOR (as a corporation) does not itself undertake to furnish any health services benefits. ANCHOR pays, to the professional staff involved, for the benefits received by virtue of the authority vested in it by the Illinois Voluntary Health Services Plans Act. ANCHOR's obligation is limited to furnishing health benefits through contracts with the professional staff. *The corporation is not, in any event, liable for any act or omission of the professional staff."* (Emphasis added.)

On January 14, 1988, the trial court heard arguments on Anchor's motion to dismiss. Plaintiffs argued that the admission by Anchor that it operated in a dual capacity, both as a qualified HMO and as a Health Plans Act corporation, created a genuine issue of material fact as to whether the actual medical care provided to Ashor Moshe was provided in Anchor's capacity as a Health Plans Act corporation or in

its capacity as an HMO. They maintained that, to the extent that care was provided under the State or Federal HMO statutes, neither of which contains an immunity clause, Anchor should not be permitted to claim total immunity solely by virtue of its Health Plans Act charter. Plaintiffs also claimed that there remained a factual question of whether Anchor regulated physician care or otherwise violated the "unique organizational structure" required under that statute, and by so doing, relinquished its right to insulation from all liability. Anchor countered with the argument that its charter was duly obtained by compliance with all specific requirements of the Health Plans Act, that it had complied with all periodic reporting requirements since 1971, that its operations had been at all times subject to supervision by the Director of Insurance, as provided in the statute, and that its charter had never been revoked. Therefore, unless and until that charter was revoked by the Director, as expressly provided in section 9 of the statute (Ill. Rev. Stat. 1981, ch. 32, par. 603), Anchor would remain entitled to the statutory immunity granted by section 26. Anchor further noted that nowhere in the Illinois HMO Act does the legislature state that certification under that Act would terminate the statutory immunity granted to Health Plans Act corporations, although the lawmakers were well aware, in 1974, of that longstanding immunity. The trial court, stating that it had reviewed pertinent Health Plans Act provisions and relevant case law, granted Anchor's motion.

While this appeal was pending, the Illinois legislature amended the Health Plans Act to effectively accomplish the following: (1) permit no new Health Plans Act charters unless the organization to be so chartered had also been approved as a health maintenance organization under the Illinois HMO Act; (2) eliminate statutory immunity for most corporations already chartered under the Health Plans Act, including corporations such as Anchor; and (3) provide for these changes, along with some amendments to the Illinois HMO Act (relating to prescription drugs and the insurance licensing of HMO's which enroll public aid and medicare recipients) to take effect immediately upon becoming law, *i.e.*, August 30, 1988. (Pub. Act 85−1246, eff. August 30, 1988.) The current version of section 26 of the Health Plans Act provides as follows:

"A health services plan corporation *incorporated prior to January 1, 1965, operated on a not for profit basis, and neither owned [n]or controlled by a hospital* shall not be liable for injuries resulting from negligence, misfeasance, malfeasance, nonfeasance or malpractice on the part of any officer or em-

ployee of the corporation, or on the part of any person, organization, agency or corporation rendering health services to the health services plan corporation's subscribers and beneficiaries." Ill. Rev. Stat., 1988 Supp., ch. 32, par. 620.

In their reply brief submitted to this court, plaintiffs argue that, by reason of the recent amendment of section 26 by the legislature, we need not even reach the issue of whether the immunity conferred by the Health Plans Act, as originally enacted, extended to Anchor's activities requiring certification as an HMO. They contend that under the unambiguous language of the 1988 amendment, Anchor no longer has any immunity to assert, and that the trial court's order, dismissing Anchor from the case, must be reversed.

## Opinion

The parties do not dispute that Anchor was duly chartered as a Voluntary Health Services Plans Act corporation in 1971 and remained so chartered up to and including all times relevant to this lawsuit. Nor is it disputed that Anchor filed all required annual reports and otherwise complied with all mandatory procedural provisions of that statute. Clearly, Anchor's status as a Health Plans Act corporation is conclusively established by the record and is not at issue here. Nonetheless, plaintiffs contend, as they did in the circuit court, that the dual status of Anchor as Health Plans Act corporation and health maintenance organization somehow precludes the automatic application to Anchor of the grant of immunity in the Health Plans Act, as a matter of law, without further factual inquiry into the "capacity" (i.e., whether as Health Plans Act corporation or as HMO) in which Anchor provided health services to minor plaintiff. We have reviewed the pertinent provisions of the Health Plans Act, relevant case law, and the legislative history of the 1988 amendatory act. As further explained below, we find that the trial court was correct in concluding that Anchor's dual status would not preclude operation of the immunity provision, as originally enacted, to bar all malpractice claims against it as a matter of law. With the evidence before him, and given the express provision of immunity in the Health Plans Act on the date of his dismissal order, we believe that the trial judge came to the proper conclusion. Therefore, the dispositive issue of this case can be simply stated. Should the 1988 amendment, eliminating statutory immunity for a class of Health Plans Act corporations which certainly includes Anchor HMO, be applied retroactively to allow plaintiffs' claims against this defendant? For reasons which follow, we hold that it should not.

Preliminarily, we observe that the legislature enacted no amendments to section 26 of the Health Plans Act in the 37-year period between 1951 and the recent amendment at issue in this case. During this period, in 1974, the Health Maintenance Organization Act became law. (Ill. Rev. Stat. 1975, ch. 111½, par. 1401 *et seq.*) That statute describes a "Health Care Plan" subject to its regulation as follows:

" 'Health Care Plan' means any arrangement whereby any person undertakes to provide or arrange for, pay for, or reimburse any part of the cost of any basic health care services [and at least part of] such arrangement consists of arranging for or the provision of such health care services, as distinguished from mere indemnification against the cost of such services, on a per capita prepaid basis, through insurance or otherwise." (Ill. Rev. Stat. 1981, ch. 111½, par. 1402(5).)

Under the original Health Maintenance Organization Act, any "person," including foreign corporations, could apply and be certified as an HMO. (Ill. Rev. Stat. 1975, ch. 111½, par. 1403(a).) In 1982, the statute was amended to provide that only an "organization" could be certified as an HMO. (Ill. Rev. Stat. 1987, ch. 111½, par. 1403(a).) An "organization" is defined in relevant part as "a nonprofit corporation authorized under *** The Voluntary Health Services Plans Act." Ill. Rev. Stat. 1987, ch. 111½, par. 1402(11).

The only appellate case specifically addressing the malpractice immunity of Voluntary Health Services Plans corporations is *Brown v. Michael Reese Health Plan, Inc.* (1986), 150 Ill. App. 3d 959, 502 N.E.2d 433, in which this court upheld the constitutionality of section 26 against an equal protection challenge. In affirming the trial court's decision, dismissing a malpractice complaint against Michael Reese Health Plan solely on the basis of an asserted section 26 immunity, we stated:

"From our reading of these provisions of the Voluntary Health Services Plans Act, we believe the legislature has clearly carved out a separate and distinct classification of health care providers. The voluntary health services plan is distinguishable from other health care providers because they serve the unique function of both insurer and health care provider. The health services plan is regulated by the Department of Insurance and governed by specific legislative requirements, unlike other, unregulated health care providers. In our opinion, this unique organizational structure and regulation of the voluntary health services plan corporation provides a rational basis for immunizing the defendant corporation in the instant case

\*\*\*." (*Brown v. Michael Reese Health Plan, Inc.*, 150 Ill. App. 3d at 961-62, 502 N.E.2d at 434-35.)

A health provider's dual capacity, as Health Plans Act corporation and HMO, was not an issue in *Brown*, and the opinion gives no indication as to whether Michael Reese Health Plan was also a certified HMO at times relevant to that litigation. However, *Brown* leaves no question about the legitimacy of the statutory immunity conferred upon all Health Plans Act corporations by section 26, prior to its recent amendment.

The legislative history of the 1988 amendment to the Health Plans Act reveals that Public Act 85—1246, which incorporates the amendment, originated as House Bill 3806, sponsored by Representatives Shaw, Flowers and Rice. (85th Ill. Gen. Assem., House Bill 3806, 1988 Sess.) As introduced by Representative Shaw on April 8, 1988, House Bill 3806 sought to amend only the Illinois HMO Act, to require the insurance licensing of HMO's enrolling public aid recipients. (85th Ill. Gen. Assem., House Proceedings, April 8, 1988, at 264.) Senator Jones, the bill's Senate sponsor, subsequently offered an amendment which would have changed some provisions of the Health Plans Act as well, but not the section 26 immunity provision. (85th Ill. Gen. Assem., Senate Proceedings, June 15, 1988, at 1786-88.) The amendatory language here at issue was the product of a conference committee appointed to consider differences between the Senate and House versions of the bill. Its report, incorporating the new language of section 26, was adopted by both houses of the legislature, following debate, on June 30, 1988. (85th Ill. Gen. Assem., Housing Proceedings, June 30, 1988, at 5634-37.) The only substantive discussion of the statutory immunity provision occurred during the June 30, 1988, Senate debate on the conference committee report. The following is a portion of that discussion:

"Senator Jones: \*\*\* First Conference Committee Report \*\*\* repeals the immunity for civil liability granted to the medical plans under the voluntary health service plans. \*\*\*

\* \* \*

Senator Geo-Karis: \*\*\* I understand that the exemption from liability that the Health Service Plan Corporation currently has for injuries resulting from negligence on the part of officers or employees of the corporation is taken out. So they are ... they do have liability, is that correct?

\*\*\*

Senator Jones: Right now, it's [*sic*] only three that falls [*sic*] under the particular Act and they are immune for ... immune

from liability, this takes away that immunity.

\* \* \*

Senator Barkhausen: ... Senator Jones, ... can you tell me how many HMO's there are that are now organized under the Statute providing for a [*sic*] voluntary health service plans and providing for some degree of immunity for those plans?

\* \* \*

Senator Jones: There are three.

\* \* \*

Senator Barkhausen: \*\*\* [M]y question and concern is ... whether you can tell me *whether this eliminates the immunity for all HMO's that previously were guaranteed statutory immunity from liability suits?*

\*\*\*

Senator Jones: \*\*\* [T]he only group that ... is... is exempt would be the Union Health Service but it does take away the immunity for all the others.

\*\*\*

Senator Barkhausen: Can you tell me why the provisions [of the Conference Report] maintain the immunity for one HMO organized under ... as a voluntary health service plan and apparently not for the others?

\*\*\*

Senator Jones: Because it is a not-for-profit and it's not owned by a hospital.

\*\*\*

Senator Barkhausen: \*\*\* [A]s I understand it, there are three HMO's that are organized as voluntary health service plans that have been provided with statutory immunity for ... for a very good reason under legislation dating back to 1951, and \*\*\* we're only changing the rules for two of them. \*\*\*

\*\*\*

Senator Jones: \*\*\* There would be one that you're speaking of that we did not take it away [*sic*] is just a service organization but the provisions in this piece of legislation \*\*\* tak[e] care of the problem that we have \*\*\* relat[ing] to HMO's, and I ask for a favorable vote on this Conference Committee Report." (Emphasis added.) 85th Ill. Gen. Assem., Senate Proceedings, June 30, 1988, at 154-55, 159, 160-61.

The 1988 amendments to the Health Plans Act, requiring that all corporations subsequently chartered under the Act also be certified as HMO's, while simultaneously eliminating the statutory immunity for

HMO's already organized under the Act, with the single exception of a union-based service plan which still conformed to the Act's original concept, manifest a clear legislative intent: to bring those HMO's chartered under the Health Plans Act into conformity with other Illinois HMO's in several respects, including their malpractice liability potential. The legislative history, as seen from the above excerpts, further supports the conclusion that, prior to the amendment, corporations such as Anchor, regardless of any "dual capacity" in which they operated, enjoyed complete statutory immunity from such liability. Moreover, the general rule is that a statutory amendment creates a presumption that the legislature intended the amendment to change the law as it formerly existed (*Sanchez v. Access Associates* (1989), 179 Ill. App. 3d 961, 966, 535 N.E.2d 27, 30), not to clarify the law as it existed. In the case before us, neither the amendatory language nor its legislative history can be reasonably construed as overcoming this presumption.

■ We turn then to the dispositive question. Should the 1988 amendment to section 26 be given retrospective application, permitting plaintiffs to pursue, against Anchor, a cause of action which accrued in 1982? The principles governing the interpretation of statutes with respect to their prospective or retroactive application were most recently and comprehensively articulated by our supreme court in *Rivard v. Chicago Fire Fighters Union, Local No. 2* (1988), 122 Ill. 2d 303, 522 N.E.2d 1195. As the court stated in *Rivard*, the long-standing general rule is that prospective application of statutes is to be preferred to retroactive application. Thus, an amendatory act will generally be construed as prospective. (*Rivard*, 122 Ill. 2d at 308-09, 522 N.E.2d at 1198.) The preference for prospectivity is based upon "[the] fundamental principle of jurisprudence that retroactive application of new laws is usually unfair. There is a general consensus that notice or warning of the rule should be given in advance of the actions whose effects are to be judged ***." (2 N. Singer, Sutherland on Statutory Construction §41.02, at 340 (Sands 4th ed. 1986).) However, when a change of law merely affects the remedy or matters of procedure, an amendment will be construed as retroactive so long as that is what the legislature intended, and absent a saving clause as to existing litigation, all rights of action will be enforceable under the new procedure, without regard to whether they accrued before or after such change or whether the action has been instituted, unless this would result in deprivation of a vested, constitutionally protected right. (See *Rivard*, 122 Ill. 2d at 310, 522 N.E.2d at 1199; *Maiter v. Chicago Board of Education* (1980), 82 Ill. 2d 373, 390-91, 415 N.E.2d

1034, 1042.) In the case of procedural changes, the legislative intent may be discerned through the usual devices of statutory interpretation, including an examination of the objective to be obtained, the reason and necessity for the statute, and its legislative history. (*Rivard*, 122 Ill. 2d at 310, 522 N.E.2d at 1199.) On the other hand, where the change is "substantive" rather than "procedural," there is a presumption of prospectivity which is rebuttable only by the act itself. In order for a substantive change in the law to apply retroactively, "the act must clearly indicate that the legislature intended a retroactive application," either by its express language or by "necessary implication." *Rivard*, 122 Ill. 2d at 309, 522 N.E.2d at 1198.

■■ Because there is a presumption of prospectivity for substantive changes in the law, we must first determine whether the 1988 amendment, eliminating Anchor's statutory immunity from malpractice liability, is substantive or procedural. As our supreme court has noted, the line between "substance" and "procedure" may often be unclear, and there is no simple formula for determining whether an amendment relates to a procedural, or to a substantive right. (*Rivard*, 122 Ill. 2d at 310, 522 N.E.2d at 1199; *Orlicki v. McCarthy* (1954), 4 Ill. 2d 342, 348, 122 N.E.2d 513, 516.) Generally, procedural law has been defined as " '[t]hat which prescribes the method of enforcing rights or obtaining redress for their invasion; machinery for carrying on a suit.' " (*People v. Ruiz* (1985), 107 Ill. 2d 19, 22, 479 N.E.2d 922, 924, quoting Black's Law Dictionary 1367 (4th ed. 1951).) Amendments changing statutes of limitation, for example, are generally characterized as procedural (*People v. Bates* (1988), 124 Ill. 2d 81, 85, 529 N.E.2d 227, 228), and have been applied retroactively where the party affected has a reasonable time to bring an action after enactment of the change (*Board of Education of School District No. 170 v. Illinois State Board of Education* (1984), 122 Ill. App. 3d 471, 474, 461 N.E.2d 567, 569). (See also *People v. Ruiz* (1985), 107 Ill. 2d 19, 479 N.E.2d 922 (statutory amendment providing that post-conviction petitions shall be heard by a judge not involved in the original proceeding is procedural in nature); *Ogdon v. Gianakos* (1953), 415 Ill. 591, 114 N.E.2d 686 (amendment changing manner of service of process deemed to be procedural and applied retroactively).) The service of process statute in issue in *Ogdon* was, the court concluded, "certainly not a part of that law which *creates, defines, or regulates rights.* *** The issue or service of process is not what *makes one a party to a suit*. It is merely a step in obtaining jurisdiction of his person after he is a party to a suit." (Emphasis added.) (*Ogdon*, 415 Ill. at 596, 114 N.E.2d at 689.) By the same reasoning, the *Rivard* court

determined that the law governing the suability of voluntary unincorporated associations should be characterized as substantive. It therefore held that a statutory amendment which made unincorporated associations, as collective entities, parties to suits, where formerly, under the common law, injured parties enjoyed rights only against the individual members of such organizations, was presumptively prospective in operation. (See Ill. Rev. Stat. 1985, ch. 110, par. 2—209.1.) As the court stated, "a rule which 'makes one a party to a suit' must be considered substantive, whereas a rule which merely facilitates suit against a party is procedural." *Rivard*, 122 Ill. 2d at 311, 522 N.E.2d at 1199.

■ Applying the foregoing principles to the case at bar, we conclude that the 1988 amendment to section 26 represents a substantive change in the law. The former language of the provision, expressly stating that Health Plans Act corporations "shall not be liable" for the malpractice of their employees and health care providers, had the practical effect of extinguishing all causes of action for medical malpractice against these entities, while leaving in place injured parties' rights against the individual physicians, nurses, technicians, and hospitals involved. (See *Rivard*, 122 Ill. 2d at 311, 522 N.E.2d at 1199.) The 1988 amendment thus operates to make Anchor a party to such suits where formerly it could not have been one.

Furthermore, as Illinois courts have often stated, a retroactive law is one which "takes away or impairs vested rights acquired under existing laws, *or creates a new obligation, imposes a new duty, or attaches a new disability* in respect of transactions or considerations already past." (Emphasis added.) (*United States Steel Credit Union v. Knight* (1965), 32 Ill. 2d 138, 142, 204 N.E.2d 4, 6, quoted in *Brucato v. Edgar* (1984), 128 Ill. App. 3d 260, 270-71, 470 N.E.2d 615, 622.) Because retroactive legislation is not favored, the statute eliminating the common law immunity from suit enjoyed by voluntary unincorporated associations, addressed in *Rivard*, has also been held by this court to be substantive, and to operate prospectively, because it "creates both new rights and new obligations which heretofore did not exist." (*Brucato v. Edgar*, 128 Ill. App. 3d at 271, 470 N.E.2d at 623.) Likewise, this court has refused to apply retroactively, in the absence of clear legislative intent, a statutory amendment to section 2—611 of the Civil Practice Law (Ill. Rev. Stat. 1987, ch. 110, par. 2—611). That amendment, imposing sanctions on attorneys for pleadings signed by them which are in violation of that section, where previously sanctions were applicable only against parties to the suit, was held to be substantive, not procedural, because it created a new obligation. (*Ig-*

*narski v. Heublin* (1988), 171 Ill. App. 3d 830, 835-37, 525 N.E.2d 995, 998.) Prior to *Ignarski*, this court had also held that a statutory amendment to the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1981, ch. 127, par. 1014.1(b)), authorizing an award of attorney fees to parties obtaining judicial invalidation of State Board of Education administrative rules, could not be applied retroactively where (1) liability for these expenses did not exist prior to the enactment of the amendment; (2) the conduct giving rise to possible liability occurred prior to the amendment's effective date; and (3) the State Board could not have avoided or limited its liability by taking any action after the effective date. (*Board of Education of School District No. 170 v. Illinois State Board of Education*, 122 Ill. App. 3d at 477, 461 N.E.2d at 572.) The same reasoning logically applies to the amendment at issue here.

Moreover, we must reject plaintiffs' argument that the substantive/procedural question may be answered by looking to those cases which have addressed changes in the law of interspousal tort immunity. (See Ill. Rev. Stat. 1987, ch. 40, par. 1001.) While it is true that in Illinois, following *Allstate Insurance Co. v. Elkins* (1979), 77 Ill. 2d 384, 396 N.E.2d 528, courts have viewed interspousal tort immunity as a procedural, rather than a substantive, bar to actions between spouses, they have done so in the light of a crucial distinction between interspousal immunity and the kind of statutory immunity conferred on corporations chartered under the Health Plans Act. As explained in *Elkins*, "the effect of the 1953 amendment [codifying interspousal immunity] was not to destroy the cause of action of the injured spouse, but to confer immunity on the tortfeasor spouse, *which like a defense based upon the statute of limitations can be waived by the defendant spouse.*" (Emphasis added.) (*Elkins*, 77 Ill. 2d at 390, 396 N.E.2d at 531; see also *State Farm Mutual Automobile Insurance Co. v. Palmer* (1984), 123 Ill. App. 3d 674, 680, 463 N.E.2d 129, 133.) In other words, interspousal tort immunity is a defense which can be waived, not a substantive bar that would prevent the cause of action from accruing in the first place. (*Perkins v. State Security Insurance Co.* (1989), 192 Ill. App. 3d 103, 106, 548 N.E.2d 568, 570.) By contrast, the statutory immunity granted to Health Plans Act corporations in the original 1951 legislation, in order to further a unique organizational and regulatory scheme, was nonwaivable. It operated to prevent a cause of action from coming into being, and is therefore, under the *Rivard* principles, substantive rather than procedural.

■ Having determined that the 1988 amendment to section 26 of

the Health Plans Act is substantive, we next inquire whether the presumption of prospectivity to be accorded that legislation can be overcome, either by the express language of Public Act 85—1246, or because a retrospective intent appears "by necessary or unavoidable implication." (*United States Steel Credit Union v. Knight* (1965), 32 Ill. 2d 138, 142, 204 N.E.2d 4, 6.) An examination of the Act reveals no express language directing that all or any of the amendments therein be given retroactive application. "Necessary implication refers to a logical necessity; it means that no other interpretation is permitted by the words of the statute construed." (*In re Application of County Treasurer of Cook County for Sale of Certain Real Estate for Delinquent Taxes* (1973), 14 Ill. App. 3d 1062, 1066, 304 N.E.2d 9, 12.) We also find no retrospective application by necessary implication in the legislation at issue here. The amendatory act can, in its entirety, be construed as operating prospectively from the effective date of August 30, 1988, *i.e.*, only upon transactions and occurrences on or after that date, without in any way contravening or defeating either its express provisions or the legislative objectives previously discussed. For these reasons, we find that the presumption of prospectivity is not rebutted, and that the immunity provision, as amended, cannot be afforded retroactive application.

Therefore, the trial court's order granting Anchor's motion to dismiss was not in error. That order is hereby affirmed, and this case is remanded for further proceedings against the remaining defendants.

Affirmed.

MURRAY and GORDON,* JJ., concur.

---

*Justice R. Eugene Pincham participated in this case prior to his resignation. Since that time, Justice Joseph Gordon was designated the third member of the panel and has read the record and briefs and has listened to the oral argument tapes.