(No. 67590.—

MARCUS BATTEAST, a Minor, *et al.*, Appellees, v. WYETH LABORATORIES, INC., *et al.*, Appellants.

*Opinion filed July 3, 1990.—Rehearing*
*denied October 1, 1990.*

Robert A. Downing, Sara J. Gourley and Eugene A.

Schoon, of Sidley & Austin, and Kendal A. Crooks and John P. Prusik, of Crooks & Gilligan, all of Chicago, for appellants.

Holstein, Mack & Klein, and William J. Harte, Ltd., both of Chicago (William J. Harte, Robert A. Holstein, John M. Mack and John B. Austin, of counsel), for appellees.

JUSTICE WARD delivered the opinion of the court:

In 1977, the plaintiffs, Marcus Batteast, a minor, and his parents, filed suit in the circuit court of Cook County against Dr. Edgar Dela Cruz, his partner, Dr. Joseph Abella, and St. Bernard Hospital, among others, alleging negligence and willful and wanton misconduct in their treatment of Marcus, who, while under the care and supervision of these defendants, was injured from an overdose of a drug manufactured by Wyeth Laboratories, Inc., a division of American Home Products Corporation (Wyeth).

In 1980, the plaintiffs filed a separate action against Wyeth based on theories of negligence, strict liability, and willful and wanton misconduct. In this action, the plaintiffs alleged that Wyeth manufactured and distributed aminophylline suppositories in a defective condition, unreasonably dangerous to children, in part because it: (1) failed to warn the medical profession of the product's dangerous propensities to children, and (2) failed to supply sufficient information for methods of avoiding toxicity and administering overdose therapy. Plaintiffs further alleged that the defective condition of the product was a proximate cause of Marcus' injuries and that Wyeth took a course of action which showed an utter indifference to, or a conscious disregard for, the safety of others.

The two actions were consolidated. Prior to trial, the case against Dr. Dela Cruz was dismissed pursuant to a

settlement agreement. A settlement was reached with Dr. Abella in the second week of trial, and a settlement was reached with the hospital while the jury was deliberating. The settlement agreement with Dr. Dela Cruz provided, in part, that he would be available to testify at the trial if called by either party, that he would not "color, alter, or otherwise deviate from" his deposition testimony, "either in favor of or adversely to Batteast," and that he would "vigorously continue to defend himself." Pursuant to a jury verdict in plaintiffs' favor, judgment was entered against Wyeth in favor of Marcus for $9.2 million in compensatory damages, and $13 million in punitive damages, and in favor of Marcus' parents for $85,000 for medical expenses they had incurred. The appellate court affirmed (172 Ill. App. 3d 114), and we granted leave to appeal (107 Ill. 2d R. 315).

Before us, Wyeth contends that (1) it is entitled to judgment notwithstanding the verdict (or, at least, a new trial) because there is no evidence that its actions were the proximate cause of the plaintiffs' injuries; (2) the compensatory damages were excessive; (3) the punitive damages were unwarranted, unconstitutional, and excessive; (4) the settlement with Dr. Abella constituted a release that discharged all remaining defendants; (5) the refusal of the trial court to permit Wyeth to cross-examine Dr. Dela Cruz about the terms of his settlement was reversible error; (6) plaintiffs' comments concerning a special interrogatory during closing argument constituted grounds for reversal; and (7) evidence and argument about Wyeth's failure to comply with FDA regulations was prejudicial error.

On January 22, 1976, Marcus was admitted to the hospital with an upper respiratory infection and febrile convulsions. His care was assigned to Dr. Dela Cruz until he was discharged on January 28. On February 5, he was readmitted with a high temperature and suffering

from dehydration, diarrhea and vomiting. After an initial diagnosis of acute gastroenteritis and pneumonia, Dr. Dela Cruz prescribed antibiotics, ordered Marcus placed in an oxygen tent, and ordered intravenous fluids for dehydration. On February 6, Dr. Dela Cruz prescribed Marax, a liquid prescription drug used to treat respiratory ailments. The next evening, a nurse phoned Dr. Dela Cruz and informed him that Marcus' intravenous catheter had come out and the nurses could not restart it, and that the plaintiff was vomiting. Dr. Dela Cruz testified that he ordered the nurse to "hold" the intravenous and to discontinue the Marax because it causes stomach irritation. Marax, however, continued to be administered to plaintiff until February 10. Dr. Dela Cruz never reviewed the medication records that revealed that fact.

On February 8, Dr. Dela Cruz prescribed one-half of a 125 milligram aminophylline pediatric suppository every eight hours to treat the plaintiff's respiratory ailment. Aminophylline is a generic drug manufactured by a number of pharmaceutical companies, including Wyeth. Aminophylline suppositories were manufactured and sold by Wyeth in three sizes: (1) 125 milligram pediatric suppositories; (2) 250 milligram adult suppositories, and (3) 500 milligram adult suppositories. Wyeth's package insert states that "when cut in half" a pediatric suppository "is suitable for a child weighing 20 pounds when administered at no less than 8-hour intervals." Plaintiff weighed 22 pounds at this time. Marax contains a small amount of theophylline, the active ingredient in aminophylline. Marax also contains ephidrine, which reacts synergistically with aminophylline to increase its toxicity.

The hospital did not stock the 125 milligram pediatric aminophylline suppositories, but used one-half of a 250 milligram suppository when a 125 milligram suppository was prescribed. Contrary to Dr. Dela Cruz' instructions,

the hospital did not administer one-half of a 125 milligram aminophylline suppository to plaintiff, but administered one-half of a 250 milligram suppository. The hospital also continued to administer the Marax even though Dr. Dela Cruz ordered its use discontinued. This medication continued from February 8 until February 10, when plaintiff suffered a seizure and was transferred to Children's Memorial Hospital. There it was determined that Marcus had suffered from an overdose of theophylline as a result of the continued administration of Marax combined with the double dosage of aminophylline. As a result, plaintiff now suffers from brain damage and epilepsy. At age 14, he had an IQ of approximately 32, the equivalent of a two- or three-year-old child.

We first consider the issues raised by the settlements with Doctors Abella and Dela Cruz. The first of these issues concerns a settlement agreement between the plaintiffs and Dr. Abella. The agreement was entered into two weeks after the trial against the hospital and Wyeth began. Wyeth contends that the agreement was a release which also discharged it from liability.

Wyeth contends that the settlement constituted a general release which, under the law applicable to causes of action which, like this one, arose before the effective date of "An Act in relation to contribution among joint tortfeasors" (Ill. Rev. Stat. 1979, ch. 70, pars. 301 through 305), released all joint and independent concurrent tortfeasors. The plaintiffs argue that the settlement agreement should be construed as a covenant not to sue, or, if it is held to be a release, that the decision of *Alsup v. Firestone Tire & Rubber Co.* (1984), 101 Ill. 2d 196, which holds that a release discharges only those defendants specifically named in its body, should apply.

The settlement agreement between Dr. Abella and the plaintiffs provides as follows:

"IN CONSIDERATION of *** ($35,000), the under-signed do hereby release and forever discharge Dr. Joe Abella and *** his *** heirs, executors, administrators, agents, successors, and assigns of and from any and all actions, causes of action, claims, demands, damages, costs, loss of services, expenses and compensation, on account of, or in any way growing out of, any and all known and unknown personal injuries and property damage resulting to or to result from *** the [injury to plaintiff]."

The first issue is whether this document is a release or a covenant not to sue. The rule prior to the Contribution Act was that a full or unqualified release as to one indivisible injury given to any of those concurring in its cause releases both joint and independent concurrent tortfeasors unless there was a reservation of rights against others. This rule governs even if the parties were ignorant of its legal effect. (*Porter v. Ford Motor Co.* (1983), 96 Ill. 2d 190.) A covenant not to sue is not a release, but a contract by the plaintiff not to sue the settling tortfeasor. Such a contract was held to be enforceable between the parties, but not to release other tortfeasors.

Though the instrument is captioned "RELEASE OF ALL CLAIMS," we consider that the circumstances surrounding its execution show, as the appellate court held, that the agreement between Dr. Abella and the plaintiffs was to have the legal effect of a covenant not to sue rather than a release, not only of Abella but of the remaining alleged tortfeasors. Dr. Abella's role in the care of Marcus was minor. He simply admitted Marcus to the hospital and that day wrote three orders which Dr. Dela Cruz ratified. The orders did not concern Marax and the suppositories Marcus was given. The amount of the settlement with Abella, $35,000, was relatively insignificant when one considers the costs already incurred for the

care of Marcus and for the predicted lifetime costs of his care. The plaintiffs describe the $35,000 as less than half the hospital expenses incurred at the time of the settlement with Dr. Abella. In interpreting a contract, we look to the circumstances to determine the parties' intentions. We consider that the intention of the parties was to discharge only Dr. Abella. The instrument purports to discharge only Dr. Abella and his heirs and assigns of claims arising against him from Marcus' injuries. It is not stated to be in "full satisfaction" of the plaintiffs' claim, as was the case in *Porter v. Ford Motor Co.* (1983), 96 Ill. 2d 190. At the time the instrument was executed by Dr. Abella, the plaintiffs' trial against the defendant here and the hospital had already commenced and, following its execution, the litigation continued. The circumstances indicate clearly that the agreement was to be a covenant not to sue; an agreement to free Dr. Abella from responsibility while retaining the plaintiffs' rights against the defendant and the hospital.

The settlement agreement between the plaintiffs and Dr. Dela Cruz raises issues of a different nature. This settlement, which was agreed to before the trial commenced, discharged Dr. Dela Cruz as a party in return for a $25,000 payment from him and a $200,000 payment from his insurance carrier. It contained the following additional undertakings on the part of Dr. Dela Cruz:

"(1) Dela Cruz, truthfully answered *** [his earlier deposition] questions and will not in the future color, alter, or otherwise deviate from such truthful answers, either in favor of or adversely to Batteast.

(2) Dela Cruz will remain available for *** further discovery to any extent required by *** the Rules of the Supreme Court of Illinois ***.

(3) Dela Cruz will remain available for trial *** and will testify in the event of trial if called by either party.

(4) Dela Cruz will vigorously continue to defend himself and will litigate fully his denial of liability in an effort to defend his professional reputation, financial interests, and other justifiable interests."

By an order *in limine* entered over Wyeth's objection, the trial court refused to permit Wyeth to cross-examine Dr. Dela Cruz as to potential bias resulting from this agreement and instructed the parties that they could tell the jury only that the plaintiffs' dispute with Dr. Dela Cruz had been "resolved." Wyeth contends that under the agreement, Dr. Dela Cruz purchased a limitation on his own liability as long as he testified in accord with the agreement, and that it was error not to allow this bias to be brought to the attention of the jury. Wyeth further contends this error was aggravated by allowing Dr. Dela Cruz to be examined by the plaintiff as a hostile witness, and by the plaintiffs' counsel's remarks on his credibility made during closing arguments.

Plaintiffs' reply is that the agreement was necessary because, at the time of the settlement, Dr. Dela Cruz was living in Hawaii and was not subject to subpoena by Illinois. They further argue that the agreement did not create a bias but was neutral in that either side could call the doctor, and the doctor was to testify in accord with his prior deposition, no matter which side that testimony favored.

The Illinois position on this point is well established. If an extrajudicial agreement has the potential to bias a witness' testimony as to a relevant issue, disclosure is necessary to maintain the fairness and integrity of our judicial system. (*Tu Hou Lam v. Lynch Machinery Division of Lynch Corp.* (1988), 178 Ill. App. 3d 229. See *Gatto v. Walgreen Drug Co.* (1975), 61 Ill. 2d 513; *Pierce v. Commonwealth Edison Co.* (1981), 101 Ill. App. 3d 272.) We are not impressed with plaintiffs' contention that the agreement was neutral. Dr. Dela Cruz agreed to

testify in a certain way, the same way he had testified in his deposition. Because plaintiffs imposed this term on the release, it was obviously the way they desired him to testify. A failure to comply with this undertaking would render him potentially liable to the plaintiffs for additional damages. Only the plaintiffs could enforce this agreement. The deposition itself had been taken before Wyeth had been made a party, and, accordingly, Wyeth could not cross-examine the doctor at that time. This agreement clearly had a potential to affect and bias Dr. Dela Cruz' testimony, and the jury should have had the opportunity to take that fact into account in assessing his credibility. This error is of the utmost significance because the testimony of Dr. Dela Cruz is essential to the plaintiffs' position on proximate cause. This fact alone requires that the case be retried.

Too, after this agreement was entered, Dr. Dela Cruz should have been dismissed as a party because an adversarial relationship no longer existed between the plaintiffs and Dr. Dela Cruz. (See *Gatto v. Walgreen Drug Co.* (1975), 61 Ill. 2d 513.) He could no longer be liable to the plaintiffs, and his interest was to testify so as not to make himself liable to the plaintiffs under the terms of the settlement agreement. The plaintiffs, however, opposed the doctor's motion to be dismissed as a defendant and were permitted to interrogate him as an adverse witness.

The defendants also assert that comments of plaintiffs' counsel during closing argument concerning a special interrogatory constituted ground for reversal. The defendants had submitted a special interrogatory which asked the jury to determine whether the hospital was the sole proximate cause of the plaintiffs' injuries. On two occasions in closing argument the plaintiffs' counsel told the jury that if it wanted to award the plaintiffs damages from the defendant drug company, its answer

to the interrogatory would have to be that the hospital was not the sole cause of the injuries.

In *Sommese v. Maling Brothers Inc.* (1966), 36 Ill. 2d 263, this court held that it is improper for counsel to reveal the identity of the party that submitted a special interrogatory to the jury, and to inform them of the necessity of conforming the answer to the special interrogatory with their general verdict. It is proper, however, to argue to the jury that a special interrogatory should be answered in accordance with the evidence. (*Macias v. Inland Steel Co.* (1986), 147 Ill. App. 3d 411.) Here, the plaintiffs' counsel did not expressly state that the answers to the special interrogatory and the general verdict must be consistent. His argument that the jury should answer that the actions of the hospital were not the sole proximate cause of the injuries was not a statement that the jury should base its answer to the interrogatory on the evidence presented. Rather, he argued only that such an answer was necessary if the jury wanted to make an award in favor of the plaintiffs against the defendant drug company. Such an argument was not proper. In *Levin v. Welsh Brothers Motor Service, Inc.* (1987), 164 Ill. App. 3d 640, the court faced a similar issue. The defendant claimed that the plaintiff's counsel improperly advised the jury that if it answered "yes" to a special interrogatory as to whether the plaintiff's negligence was the sole proximate cause of his injuries, there could not be a verdict for the plaintiff. The plaintiff responded that if it were error, it would not have occurred if defense counsel had not interrupted his statement with an objection. The plaintiff claimed that if he had been allowed to complete his argument, he would have explained to the jury the reason why there could not be a verdict for the plaintiff. That is, if his negligence was the sole proximate cause of his injury, it would mean that the plaintiff had failed to prove his case

and could not recover. The court held that the trial court did not commit reversible error in denying a mistrial in view of the ambiguity and brevity of the statement and a subsequent cautionary instruction by the trial court. Here the objection was not sustained but denied, no cautionary instruction was given, the statement was not ambiguous, and it was repeated a second time, more forcefully after the objection had been overruled.

We need not decide if this impropriety alone would be grounds for a reversal. When combined with the failure to allow Dr. Dela Cruz to be cross-examined and possibly impeached for bias, however, it reinforces our determination that, if otherwise proper, a new trial is required.

Now we turn to the issues of liability, compensatory damages and punitive damages. The plaintiffs' complaint predicated liability against Wyeth on the basis of both strict liability in tort and negligence.

The strict liability in tort count was based on plaintiffs' contention that Wyeth manufactured and distributed its aminophylline suppositories in a defective condition, unreasonably dangerous to children, in that it failed to warn those doctors that might prescribe it of its dangerous propensities for children, and in that it failed to supply sufficient information on methods of avoiding toxicity and on overdose therapy, and that this defective condition was the proximate cause of the injuries to Marcus.

The failure to warn related to the insert included with each package of the aminophylline suppositories. In essence, it is the plaintiffs' position that this insert failed to adequately inform the prescribing doctor and/or warn the doctor of information that was known to Wyeth and that was included in a letter that the Federal Food and Drug Administration (FDA) sent to Wyeth on May 7, 1975, in conjunction with an abbreviated new drug application filed by Wyeth pursuant to a 1974 order of the

FDA, as more fully discussed below. That letter, after stating that the FDA had completed the review of the abbreviated new drug application, stated:

"We have the following comments regarding the Theobroma-based products:

1. *Revise the package insert to conform to the enclosed labeling guidelines.*

2. It is suggested that the recommended temperature range for storage be stated on the container labeling.

3. Submit representative batch formulae with actual manufacturing directions for each potency.

4. Submit container and closure specifications.

5. Submit an Environmental Impact Analysis Report.

6. Specify the manufacturer of the active ingredient actually to be employed.

7. Submit samples of drug dosage form and active ingredient. Include the results of all tests performed." (Emphasis added.)

At the time of the incident in litigation, the insert in the product being marketed by defendant Wyeth was not revised to fully reflect the information contained in the above instructing guidelines.

The first relevant provision of the guidelines was: "Warnings: *** Many children are sensitive to aminophylline. Severe intoxications and deaths have followed rectal administration because of hypersensitivity or overdose." The package insert used contained the statement: "Precautions: *** Overdosage in infants and small children has resulted in such toxic effects as vomiting, restlessness, and convulsions." An expert testified that convulsions rarely lead to coma and death.

The guidelines contained the provision: "Adverse Reactions: *** Cardiovascular: *** circulatory failure. Respiratory: *** respiratory unrest." The package insert used included the statement in its "Precautions" section

that aminophylline "causes a marked increase in cerebral-vascular resistance with an accompanying decrease in cerebral blood flow." An expert testified that this wording does not necessarily warn a prescribing physician of a severe decrease in blood supply resulting in brain damage.

The guidelines also contained statements that (1) unlike adults where rectal administration may be incomplete, slow or variable, children absorb medication into the blood quite well by rectum, (2) because rectal absorption of aminophylline is unreliable, the cumulative effect of prolonged treatment by this means of administration must be kept in mind, and (3) because of this wide variation from patient to patient and the relatively narrow therapeutic blood level range, dosage must be individualized with monitoring of theophylline blood levels, particularly when prolonged or repeated use is planned. No comparable statements appeared in the Wyeth package insert.

The guidelines state: "Aminophylline should not be administered concurrently with other xanthine preparations." On the same topic, they further state: "Toxic synergism with ephedrine and other sympathomimetic bronchodilator drugs may occur. Recent controlled studies suggest that the addition of ephedrine to adequate dosage regimens of aminophylline produces no increase in effectiveness *** but does produce an increase in toxic effect." This information is relevant in that aminophylline and Marax are xanthine preparations. The active ingredient in aminophylline is theophylline and Marax contains theophylline and ephedrine.

The guidelines state that the "most consistent" adverse reactions are:

"(1) Gastrointestinal irritation: nausea, vomiting, epigastric pain generally preceded by headache, hematemesis, diarrhea; (2) Central nervous system stimulation; irri-

tability, restlessness, insomnia, reflex hyperexcitability, muscle twitching, clonic and tonic generalized convulsions, agitation; (3) Cardiovascular: *** marked hypertension, and circulatory failure; (4) Respiratory: *** [fast breathing], respiratory arrest; *** (6) Others: fever, dehydration."

They also state that overdose symptoms in infants and small children are agitation, headache, hyperreflexia, fasciculations, and clonic and tonic convulsions. The package insert used states in the "Precautions" section that in infants and small children an overdose has resulted in such toxic effects as vomiting, restlessness and convulsions, and that "headache, nervousness, and vomiting, abdominal cramps and diarrhea are common symptoms of sensitivity to aminophylline, especially if given intravenously in full therapeutic doses."

The dosage provisions in the guidelines suggest that a maximum dosage for a 24-hour period consists of 12 milligrams of aminophylline for each kilogram of a child's weight with a dose every six hours. The Wyeth insert suggests that a dosage of seven milligrams per kilogram as a rectal suppository appears effective and safe, and states that the 125 milligram suppository, when cut in half, is suitable for a child weighing 20 pounds if administered at no less than eight-hour intervals. There was expert testimony that if a suppository is cut in half, all of the medication could be in the half utilized on a given occasion because of uneven distribution.

With respect to the plaintiffs' claim that the product was defective because of Wyeth's failure to supply adequate information for methods of avoiding toxicity and for overdose therapy, the guidelines state that the drug is to be discontinued immediately if an overdose occurs. The guidelines continue:

"No specific treatment. *** Enemas for rectally administered overdoses. *** Avoid sympathomimetics. Support-

ing treatment for hypertension, seizure, arrhythmias, and dehydration. Sedatives such as short-acting barbiturates will help control central nervous system stimulation. Restore the acid-base balance with lactate or bicarbonate. Oxygen and antibiotics provide supportive treatment."

Wyeth's package insert contains no discussion of the treatment of an overdose.

Wyeth contends that even if its package insert could be considered as causing the drug to be deemed defective as not containing adequate information regarding its use, the hospital's actions in giving plaintiff six double doses of aminophylline and nine doses of Marax after it had been ordered discontinued, together with the failure of Dr. Dela Cruz to check the hospital medication records, constituted an unforeseeable misuse of the product and an unforeseeable intervening cause as a matter of law. It further argues that the evidence that the medication could have been unevenly distributed in the two halves of a capsule is irrelevant because there was no evidence that it was, and, even if it had been, it would have evened out when the other half was given as the next dose. Failure to provide overdose instructions, it argues, was irrelevant because the overdose was properly treated once it was diagnosed.

The plaintiffs based their response on the testimony of Dr. Dela Cruz that if he had been properly informed of the dangers of aminophylline, especially to children, he would not have prescribed it, or, if he had, he would have monitored the hospital medication records more closely. He also testified that if he had known of the need for individual monitoring, he would have done so and thereby discovered the overdose, and if he had known of the synergistic effect of an active ingredient in Marax with aminophylline, he would not have used them both or would have used blood-level studies. Dr. Dela Cruz further testified that if he had been informed that

clonic and tonic convulsions are symptoms of aminophylline overdose, they would have been a "tip off" to him that maybe the aminophylline suppositories were involved.

The evidence that the allegedly deficient information given by Wyeth contributed to cause the injury was presented through the testimony of Dr. Dela Cruz. He testified that if more complete data had been given, he would not have prescribed the drug, or if he had, he would have monitored its effect with blood-level tests and checked the hospital medication records, and, accordingly, would have diagnosed the overdose more quickly.

Wyeth argues that the decision of the trial court to allow this question to go to the jury was in violation of this court's decision in *Kirk v. Michael Reese Hospital & Medical Center* (1987), 117 Ill. 2d 507. We disagree.

In *Kirk*, it was held that a drug company had no duty to the plaintiff when the plaintiff was injured in an automobile driven by a patient who had been prescribed a drug manufactured by the drug company. The accident had resulted from the patient's consuming an alcoholic beverage after receiving the drug, and although the drug company had warned doctors of the danger of taking alcohol concurrently with the medication, the doctors had not warned the patient. While the plaintiff had argued that the warnings were inadequate, this court held the question of the adequacy of the warnings was irrelevant because the liability of a manufacturer includes only those to whom injury from a defective product may reasonably be foreseen, and the plaintiff was not included in that class. The issue in *Kirk* was one of the existence of a duty to the plaintiff; here, there was an acknowledged duty to the plaintiff and the issue is one of proximate causation. Wyeth further argues that allowing this issue to go to the jury was in violation of decisions from other jurisdictions that hold that a doctor's failure to follow

the product instructions eliminated any possibility of liability of the manufacturer for improper instructions. (See *Mulder v. Parke Davis & Co.* (1970), 288 Minn. 332, 181 N.W.2d 882; *Magee v. Wyeth Laboratories, Inc.* (1963), 214 Cal. App. 2d 340, 29 Cal. Rptr. 322; *Formella v. Ciba-Geigy Corp.* (1980), 100 Mich. App. 649, 300 N.W.2d 356.) Here, however, the doctor followed the instructions, and an issue exists whether proper warnings would have caused him not to prescribe the drug or to take additional steps to determine that his instructions were not being followed or to insure they were followed before the plaintiff's injuries were incurred.

We consider it clear that any fault in the package instructions which may have prevented the discovery and prompt, effective treatment of the overdose could constitute a legally recognized proximate cause of the injuries, being subsequent in the chain of causation to the improper administration of the medication, and we further believe that there was sufficient evidence of that situation to go to the jury and to deny a judgment notwithstanding the verdict with respect to it. Accordingly, the cause must be remanded for a retrial of this issue.

On the question of negligence, the plaintiffs defensively argue that the failure of Wyeth to conform to certain regulations of the FDA was properly submitted to the jury as evidence of negligence. (The regulations concern marketing of drugs; they do not concern the guidelines discussed above.) Under our decisions, a violation of a safety statute or regulation may be *prima facie* evidence of negligence if two conditions are fulfilled. The law must be designed to: (1) protect a class to which the plaintiff belongs, and (2) the injury must have a direct and proximate connection with the regulation. (*Barthel v. Illinois Central Gulf R.R. Co.* (1978), 74 Ill. 2d 213, 219-20; 3 R. Michael, Illinois Practice, Civil Procedure Before Trial §24.9, at 393-94 (1989).) Whether these con-

ditions have been satisfied is a question of law for the court. (*Quinn v. Sigma Rho Chapter of Beta Theta Pi Fraternity* (1987), 155 Ill. App. 3d 231.) The plaintiff must also establish that violation was the proximate cause of the injury. *Barthel v. Illinois Central Gulf R.R. Co.*, 74 Ill. 2d at 219-20.

In this case, the alleged violations do not satisfy those conditions of admissibility for two reasons. First, the regulations in question applied to the efficacy of the drug and not its safety, and hence the injuries were not of the type that the regulations were designed to prevent. (*Barthel v. Illinois Central Gulf R.R. Co.* (1978), 74 Ill. 2d 213.) Secondly, even if this were not true, any violation of these regulations which might have occurred was not the proximate cause of the injury to plaintiff. There was no evidence that any aspect of Wyeth's product referred to by these regulations, orders and rulings had any causal relationship to Marcus' injury. Therefore, the evidence was improperly submitted to the jury and was improperly considered in reference to punitive damages.

For the reasons given, the judgments of the circuit and appellate courts are reversed, and the cause is remanded to the circuit court of Cook County for a new trial.

*Judgments reversed;*
*cause remanded.*