**Douglas ROLAND and Beverly Roland, Plaintiffs–Appellants,**

v.

**Albert Joseph LANGLOIS, Individually and as Agent for Astro Amusement Company, an Illinois corporation, Village of Libertyville, an Illinois Municipal corporation, and Civic Center Foundation of Libertyville, Incorporated, an Illinois corporation, Defendants–Appellees.**

**No. 90–2271.**

United States Court of Appeals, Seventh Circuit.

Argued May 28, 1991.

Decided Oct. 3, 1991.

*report the crime. See* 742 F.Supp. at 496 n. 30.

Jack Toporek (argued), Chicago, Ill., for plaintiffs-appellants.

Nancy G. Lischer, Carlton D. Fisher (argued), James M. Forkins, Jr., Kendall Griffith, Hinshaw & Culbertson, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, WOOD, Jr. and FLAUM, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Most of us associate carnival rides with fun and enjoyment. Indeed, this country's unending stream of outdoor festivals would lose a great deal of charm without the familiar ferris wheel or those contraptions that gyrate and spin in order to give riders a thrill. Douglas Roland and his wife would beg to differ, however. Their experience with one particular carnival ride end-

ed in tragedy, and their lives are unlikely to ever be the same.

This tale begins happily enough. While serving two weeks of active duty as a reservist at Great Lakes Naval Station, Douglas and a companion he met at the base, Chief Charles Harvey, decided to spend some of their free time at an annual outdoor festival in Libertyville, Illinois. Attendance was high that evening and the festival grounds were crowded with people.

The adult carnival rides were located at the southern edge of a park and abutted Church Street, which acted as a midway. *See* Appendix A: Plaintiff's Exhibit No. 25, redrafted for publication. The "Spider" and the "Zipper" were set up east-to-west along the north side of the street with a "SuperPitch" between them. From their point of contact with the street, the rides extended back toward a library building.

The Zipper is, in plaintiffs' words, a "large dangerous machine" that is somewhat analogous to a large whirling chain saw. *See* Appendix B (photograph of Zipper taken at location other than Libertyville festival). Passengers sit in tubs that spin and travel around a boom while the boom itself makes 360–degree rotations. When horizontal, the boom is over twenty feet off the ground. When fully vertical, it extends fifty-five feet into the sky. The Spider is only sixteen feet high—much closer to the ground; its passengers ride in spinning buckets that attach to arms emanating from a common hub.

The operational areas of the Zipper and the Spider were enclosed by metal fencing. The Zipper's perimeter fence was then connected to the SuperPitch, which was in turn connected to the Spider's perimeter fence. This setup formed a barrier to patrons who otherwise might have walked between the rides.

The Zipper was anchored by a flatbed trailer that extended back onto the grass lawn in front of the library. It connected at that point to a green plastic fence that cordoned off and protected the library lawn from damage by the patrons. The east side of the library fence abutted a portion of the Spider's perimeter fencing. The two fences were not connected, creating a narrow "passageway." Still farther east, another fence extended south toward the Spider's perimeter fencing. It stopped three to four feet short of contact.

The end result was that, starting to the east of the Spider, patrons could travel west through the three-to-four-foot gap just described. From there, they could continue behind the Spider's perimeter fence until they reached the narrower passageway created by the near intersection of the Spider's perimeter fence and the library fence. If patrons traveled through this passageway, they would be standing in an area bordered by the Spider's perimeter fence on the east, the library fence on the north, the Zipper flatbed on the west, and the SuperPitch frame and Zipper perimeter fence on the south. There were no rides or concessions in this area; it was completely empty. No signs or barriers warned patrons that this was a restricted area.

At approximately 8:30 p.m. on June 26, 1986, Douglas and Harvey left the crowded midway and followed this "path" behind the Spider's perimeter fence, through the junction involving the library fence, into the empty area behind the Zipper. From there, the two men had a number of options. They could turn back. They could climb over the library fence and onto the lawn that it guarded. They could also attempt to climb over the Zipper flatbed. And last, they could enter the Zipper's operational area from the rear and cut through to the midway, where a queue of potential riders waited to board the Zipper.

For reasons that are not known and likely never will be known, Douglas and Harvey chose the last option. Like the perimeter fencing for the Spider, the Zipper's sectional perimeter fencing was made of metal and weighed about twenty to twenty-five pounds per section. If anchored and secured according to manufacturer's standards, the fencing would not have permitted easy entry into the operational area of the Zipper.

The fencing apparently was not set up according to manufacturer's standards. Albert Langlois, the Zipper's foreman and

the person responsible for setting up the fencing, assumed that no one would approach the ride from the rear and had therefore failed to secure one of the rear sections. Langlois had also repeatedly moved that same section of fencing so as to go behind the Zipper and scavenge for any valuables that the ride had shaken from its passengers' pockets.

The manner in which Douglas entered the Zipper's operational area is, thus, unclear. Although Langlois, another carnival worker, and a patron maintain that the rear section of fence was closed (although apparently not secured), other deposition testimony suggests that Douglas walked through a gap in the fence. In any event, Douglas entered the Zipper's operational area and, after taking a few steps, stood directly underneath the "large dangerous machine." The Zipper, which was in full rotation, could not be brought to a quick halt; while moving toward a vertical position, it struck Douglas in the head.

Douglas's injuries were significant and required months of hospitalization. He currently suffers from organic brain syndrome, continues on medication to control his seizures, and, to this day, does not remember what happened that fated evening. In an effort to receive compensation for his injuries, as well as for his spouse's loss of consortium, Douglas and his wife sued Langlois, Langlois's employer, the sponsor and organizer of the festival, and the property owner who provided the security and crowd control. A central question below, and the central question on this appeal, is the nature of the duty that the defendants owed to Douglas.

■ The basic standards are straightforward and undisputed.[1] Illinois law defines the duty of one who controls the premises by reference to the status of the entrant, who is either an "invitee" or a "trespasser."[2] *See Ward v. K Mart Corp.*, 136 Ill.2d 132, 141–42. 554 N.E.2d 223, 227, 143 Ill.Dec. 288, 292 ( ??? ). An invitee is owed a duty of ordinary care, i.e., a duty "of reasonable care under the circumstances regarding the state of the premises or acts done or omitted on them." ILL.REV.STAT. ch. 80, para. 302. If the entrant is a trespasser, on the other hand, then the owner owes only a duty to refrain from wilful and wanton conduct. *Miller v. General Motors Corp.*, 207 Ill.App.3d 148, 158, 565 N.E.2d 687, 692, 152 Ill.Dec. 154, 159 (4th Dist. 1990), *appeal denied*, 139 Ill.2d 597, 575 N.E.2d 916, 159 Ill.Dec. 109 (1991). One exception, however, arises when the owner knew or reasonably should have anticipated the presence of a trespasser at the place of injury. If that exception applies, then the owner owes a duty of ordinary care. *Id.* at 158, 565 N.E.2d at 692–93, 152 Ill.Dec. at 159–60.

■ The defendants concede that Douglas was an invitee when he and Harvey first set foot on the festival grounds. That concession is not dispositive, however, because the rule in Illinois is not "Once an invitee, always an invitee." To the contrary, invitees can forfeit their protected status "by going to a portion of the premises to which the invitation does not extend." *Avery v. Moews Seed Corn Co.*, 131 Ill. App.2d 842, 845, 268 N.E.2d 561, 564 (3d Dist.1971); *see Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909, 912 (7th Cir.1985) ("the mere fact that you invite people onto your property for a fee does not make them business invitees on the rest of the property"); *Davis v. United States*, 716 F.2d 418, 424 (7th Cir.1983); *see also Soucie v. Drago Amusements Co.*, 145 Ill.App.3d 348, 351, 495 N.E.2d 997, 999, 99 Ill.Dec. 262, 264 (1st Dist.1986) (entrant's status determined "at the time of her injury").[3] That forfeiture, claim the defendants, is what occurred here.

---

1. The parties also agree that all of the defendants are subject to the same standard of care.

2. Some states add a third category—licensees. Illinois, however, has by statute abolished the common law distinction between invitees and licensees; the same duty is owed to both types of entrants. ILL.REV.STAT. ch. 80, para. 302.

3. The scope of the invitation obviously varies with the circumstances of individual cases, but as a general rule it extends "to the entrance to the property, and to a safe exit after the purpose is concluded; and it extends to all parts of the premises to which the purpose may reasonably be expected to take him, and to those which are

The district court agreed and granted partial summary judgment declaring that Douglas was a trespasser as a matter of law. The jury was instructed only as to the duty owed to trespassers and thereafter returned a verdict in favor of all defendants. On appeal, the Rolands do not take issue with the instructions describing the general duty owed to a trespasser and the applicable exception to that rule. Nor do they quibble with the strength of the verdict that those instructions produced. Instead, their primary contention is that the question of whether Douglas was an invitee should have gone to the jury, too. They also claim error in the rejection of jury instructions concerning invitees.

■ We review *de novo* the district court's grant of partial summary judgment and apply the same standard as that employed by the district court. *DeBruyne v. Equitable Life Assur. Soc'y,* 920 F.2d 457, 463 (7th Cir.1990). As such, we will affirm the district court's decision only if there is no genuine issue of material fact and the defendants are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). After viewing the entire record and the reasonable inferences drawn therefrom in the light most favorable to the Rolands, we believe that the district court was correct in its assessment and therefore affirm.

As a general rule, the determination of an entrant's status requires a fact-intensive inquiry and ordinarily is submitted to a jury. *Packard v. Kennedy,* 4 Ill.App.2d 177, 188, 124 N.E.2d 55, 61 (2d Dist.1955); *see also Ellguth v. Blackstone Hotel, Inc.,*

408 Ill. 343, 97 N.E.2d 290 (1951). Illinois courts have shown no hesitation, however, in treating an entrant's status as a question of law when no material facts are in dispute.[4] In *Miller,* for example, the court held "as a matter of law" that the defendant owed the plaintiff only a duty to refrain from wilful and wanton conduct. 207 Ill.App.3d at 161, 565 N.E.2d at 694, 152 Ill.Dec. at 161. And in *Soucie,* the appellate court affirmed a ruling that, "as a matter of law," the defendant owed the plaintiff only a duty to refrain from wilful and wanton conduct. 145 Ill.App.3d at 351, 495 N.E.2d at 999, 99 Ill.Dec. at 264.

■ The same type of situation exists here, as the plaintiffs have not meaningfully countered the defendants' evidence that Douglas "exceeded the scope of the invitation."[5] Douglas's invitation arose by implication, if at all, yet the Rolands offer no cognizable evidence to suggest such an implied invitation. There is no evidence, for example, that patrons actually used the operational area of the Zipper as part of a path, much less that they made use of this path while the Zipper was in operation. Nor do the Rolands offer evidence that patrons understood the operational area of the Zipper to be part of a path from the area behind the ride to the area in front. Nor is there even any reasonably detailed evidence of patrons cutting through (as opposed to around) the operational area of any other ride at the festival.[6]

Instead, the Rolands rely on evidence that several patrons started to follow

---

so arranged as to lead him to think that they are open to him." W. Keeton, D. Dobbs, R. Keeton, D. Owen, Prosser & Keeton on Torts § 61, at 424–25 (5th ed. 1984 & Supp.1988) (footnotes omitted).

**4.** *See Hopkinson v. Chicago Transit Auth.,* 211 Ill.App.3d 825, 837, 570 N.E.2d 716, 724, 156 Ill.Dec. 240, 248 (1st Dist.1991) (collecting cases); *Miller,* 207 Ill.App.3d at 161, 565 N.E.2d at 694, 152 Ill.Dec. at 161; *Soucie,* 145 Ill.App.3d at 351, 495 N.E.2d at 999, 99 Ill.Dec. at 264; *see also Lee v. Chicago Transit Auth.,* 205 Ill.App.3d 163, 168, 562 N.E.2d 556, 558, 150 Ill.Dec. 26, 28 (1st Dist.1990) ("The question of status may be decided as a matter of law if there are no factual questions present."), *appeal allowed,* 137 Ill.2d 665, 571 N.E.2d 149, 156 Ill.Dec. 562 (1991); *Lorek v. Hollenkamp,* 144 Ill.App.3d

1100, 1102, 495 N.E.2d 679, 681, 99 Ill.Dec. 232, 234 (2d Dist.1986) (same).

**5.** *See Packard,* 4 Ill.App.2d at 188, 124 N.E.2d at 61.

**6.** Langlois's deposition reveals that he had observed patrons cutting through carnival rides during his seven years as foreman of the Zipper. When asked about the number of such incidents, he replied, "A few times, few as in couple." This line of questioning was not pursued, however, and it is therefore unclear what these incidents involved or even when they occurred. When asked if he had seen anyone cut through the operational area of the Zipper, moreover, Langlois responded with one word: "Never."

Douglas and Harvey as they made their trek around the Spider. They also note that the defendants had knowledge from years past that patrons frequently cut between rides. This evidence, admittedly, might create a triable issue of fact as to whether Douglas was still an invitee as he made his way into the area behind the Zipper's perimeter fence. *Compare Poltrock v. Chicago & N.W. Transp. Co.*, 151 Ill.App.3d 250, 256, 502 N.E.2d 1200, 1204, 104 Ill.Dec. 540, 544 (1st Dist.1986) (court concluded that plaintiff did not exceed scope of invitation by walking across defendant's train tracks after deboarding defendant's train; facts showed that area where she had crossed gave appearance of being path, no signs warned her not to cross, and path was continually used as crossing by other passengers). Douglas's trek took him beyond this evidence, however; he was injured when he walked underneath the Zipper, not while he walked behind it.

The Rolands also rely heavily on the following evidence: (1) the area behind the Zipper was accessible and patrons in fact travelled there; (2) there was a gap in the rear fencing of the Zipper (or, at the very least, the fencing was unsecured); (3) no guards were posted; and (4) no signs warned patrons to "keep out." This reliance, too, is misplaced. In *Soucie,* a carnival patron was injured after she walked inside a generator trailer parked between two carnival rides. 145 Ill.App.3d at 350, 495 N.E.2d at 998, 99 Ill.Dec. at 263.[7] The facts there indicate that: (1) the trailer was positioned in an area where patrons were expected to pass; (2) the trailer door was open with no screen door or barrier of any kind obstructing entry; (3) wooden steps facilitated entry; (4) no guards were posted; and (5) no signs warned patrons to "keep out." Yet despite this evidence—the same type of evidence that the Rolands now claim should have prevented summary judgment in this case—the Illinois appellate court concluded, as a matter of law, that the injured patron "indisputably was a trespasser."[8] *Id.* at 351, 495 N.E.2d at 999, 99 Ill.Dec. at 264.

In short, the plaintiffs have offered no evidence tending to indicate a disputed issue of *material* fact regarding Douglas's status at the time of his injury. Partial summary judgment was therefore appropriate, *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1985) (party opposing summary judgment bears burden of coming forward with evidence suggesting presence of disputed issue of material fact), and the district court's decision on the matter must stand.[9]

---

7. The plaintiff was apparently suffering from some sort of mental disorder and walked into the trailer under the belief that she was a movie star and that the trailer was her dressing room. *Id.* at 350, 495 N.E.2d at 998, 99 Ill.Dec. at 263. While this fact was relevant to other issues in *Soucie,* it does not appear to be relevant to the issue of whether the plaintiff was a trespasser or not. The Rolands, moreover, are quite adamant that Douglas's subjective condition (the record indicates that he may have been intoxicated at the time of his accident) is irrelevant to our analysis.

8. The Rolands attempt to avoid *Soucie* by claiming that an opening in a fence is by definition an invitation to enter. This analysis is ultimately unpersuasive, however, because it ignores what is behind the opening. An open fence leading into a grassy meadow, for example, would give rise to a different analysis than an open fence leading into the lion cage at the zoo. The reasonable person would have noticed the "large dangerous machine" and would have taken that factor into consideration in deciding whether the operational area of the Zipper was within the scope of his or her invitation.

Additionally, both the defendants and the court in *Soucie* appear to invoke the notion that certain areas are beyond the scope of invitation *even if* the area is otherwise "open" and *even if* no signs prohibit entry. This view is not without support; the drafters of the Second Restatement of Torts, for example, indicate that "while a customer in a department store is not an invitee if he goes behind a counter without encouragement from the salesman to do so, he is an invitee in any of the aisles unless he is notified, by a sign or otherwise, that a particular aisle is closed to customers." Restatement (Second) of Torts § 332, comment *l* (1965).

9. Our disposition of this question necessarily rejects the Rolands' charge of error in the district court's failure to instruct the jury regarding "invitees." As Douglas was a trespasser at the time of his injuries, any instructions concerning invitees would have been irrelevant and were therefore properly rejected.

The Rolands raise other challenges, but they are phrased in fairly cursory terms and, like the district court, we can only respond in kind. The Rolands insist, for example, that they did not have adequate opportunity to respond to the defendants' motion for partial summary judgment and, in support of that argument, offer the following time line: The defendants' motion was originally filed ten days before trial—March 2, 1990, but was not at that time accompanied by a statement of facts or a memorandum of law. The plaintiffs pointed out this deficiency in a motion to strike filed on March 5, 1990, and the defendants filed the additional materials on the very next day, serving copies by mail. On March 8, 1990, the district court granted the defendants' motion without the benefit of a response from the plaintiffs. The trial began on March 12, 1990.

■ The record provides more detail, and a very different perspective, on this sequence of events. At a hearing on Friday, March 2, the plaintiffs acknowledged receipt of the defendants' motion and questioned the necessity of a response because the defendants' motion appeared to be "essentially a reply" to a motion that was already on file.[10] The district court, concerned that the defendants' motion might require a response, worked out an arrangement (with the complete agreement of the parties) whereby the plaintiffs would not file a written response but could offer an oral response, if they so chose, at a pretrial hearing on Thursday, March 8. The plaintiffs thereafter filed a motion to strike the defendants' motion on Monday, March 5, and received copies of the defendants' subsequently filed documents in the mail on Wednesday, March 7. The next day, when before the district court, there was only a short discussion about the defendants' updated motion:

PLAINTIFFS' COUNSEL: Your Honor, I don't know exactly how we're going to handle the mechanics of this. The defendants filed their motion for summary judgment, I filed a motion to strike because it was deficient because it was lacking certain things. They then corrected the deficiencies, which left me no opportunity to respond.

Now, there is something troubling me about the fact that I haven't had an opportunity to respond to a motion for summary judgment.

THE COURT: When you get down to the last 72 hours before the case is to begin, or whatever we are, the motion practice gets pretty hairy.

PLAINTIFFS' COUNSEL: Well, all right.

Nothing more was said on the matter and the parties turned their attention to other issues. Plaintiffs' counsel did not ask the district court to dismiss the defendants' motion on account of its late filing date; did not assert that there was insufficient time in which to respond; did not attempt to take advantage of the prior arrangement whereby an oral response could have been offered; did not ask the district court to postpone a decision until a response, written or oral, could be prepared; and did not request a postponement of the trial.

Given this record, we do not address the merits of the plaintiffs' claim. It has long been the law of this circuit (and every other circuit, for that matter) that a party cannot watch silently as purported rights are taken away and then claim error when the litigation does not go as planned. It is also the law of this circuit that a party cannot claim error after affirmatively indicating to the district court that a proposed course of action is acceptable. At least one, if not both, of these principles precludes the plaintiffs from charging error in a decision to which they gave their approval after offering, at most, only minimal protest.[11]

---

**10.** The plaintiffs had filed their own motion for partial summary judgment on February 15, 1990, requesting a ruling that Douglas was an invitee as a matter of law.

**11.** To the extent that we do not specifically follow the reasoning of the district court, we note that an appellate court may affirm on any ground that finds support in the record. *De-Bruyne*, 920 F.2d at 464 n. 10 (citing *Dairyland Financial Corp. v. Federal Intermediate Credit Bank*, 852 F.2d 242, 244 (7th Cir.1988)).

■ The Rolands also find error in a number of evidentiary rulings—the district court admitted a life-size model offered by the defendants and refused to admit some photographs and a portion of an Illinois safety regulation offered by the plaintiffs. The district court has wide discretion in these matters, however, and we can find no abuse of that discretion on this record. *See Fort Howard Paper Co. v. Standard Havens, Inc.,* 901 F.2d 1373, 1381 (7th Cir. 1990). As to the life-size model, the plaintiffs' principal complaint is that the model was not completely accurate. There is no requirement that demonstrative evidence be completely accurate, however, and the evidence was admitted only on the express condition that the jury be alerted to the perceived inaccuracies. Having reviewed the record in this case, moreover, and having struggled to familiarize ourselves with the scene of the accident, we agree with the district court that the benefits from the use of a life-size model were not substantially outweighed by the danger of unfair prejudice.[12] *See* FED.R.EVID. 403.

■ As to the photographs, the plaintiffs' argument consists solely of a one-paragraph assertion, without legal citation, that the plaintiffs were prevented from introducing photographic evidence that would have highlighted the inaccuracy of the defendants' life-size model. What is more, the argument at no point identifies a single photograph that was offered but not admitted.[13] It is asking too much, we believe, to expect this court to comb through the volumes of transcripts in order to identify which of the 157 photographs in this record are implicated and then raise, research, and resolve all possible arguments involving those photographs. An appellate court reviews arguments, it does not construct them. *See Holzman v. Jaymar–*

*Ruby, Inc.,* 916 F.2d 1298, 1303 (7th Cir. 1990).

■ As to the Illinois safety regulation, ILL.ADMIN.CODE tit. 56, § 6000.110(h),[14] the district court allowed the plaintiffs to use one portion of the regulation but refused to admit subsection (h)(1), which stated: "Fences shall be erected to resist moving or tipping and shall prevent inadvertent contact between the spectator and the rider." As the plaintiffs correctly point out, evidence concerning an applicable state regulation may be admissible to aid the trier of fact in determining the standard of care in a negligence action. *Ruffiner v. Material Serv. Corp.,* 116 Ill.2d 53, 58, 506 N.E.2d 581, 584, 106 Ill.Dec. 781, 784 (1987). The key word is "applicable," as the regulation must be designed to "protect a class to which the plaintiff belongs" and "the injury must have a direct and proximate connection with the regulation." *Batteast v. Wyeth Labs., Inc.,* 137 Ill.2d 175, 193, 560 N.E.2d 315, 323, 148 Ill.Dec. 13, 21 (1990).

■ Here, the rejected safety regulation is inapplicable; it is directed toward the prevention of inadvertent contact between spectators and riders, not between spectators and the ride. This, at least, was the conclusion of the district court, and the plaintiffs' appellate brief does not even mention that conclusion (much less take issue with it). Instead, the plaintiffs argue only that the regulation was admissible because it is "specific to the amusement industry in Illinois" and because it is "the only standard on fencing promulgated by the state." Under *Batteast* and the solid line of cases on which that opinion relies, however, these arguments are clearly insufficient.[15] The district court's ruling must therefore stand.

---

**12.** The plaintiffs apparently found the model helpful as well. They made considerable use of it during their expert's testimony.

**13.** The plaintiffs do cite generally to fifty-four pages of pretrial transcript, but these pages also fail to list any photograph offered by the plaintiffs that was rejected by the district court.

**14.** The Carnival–Amusement Safety Board enacted the regulation pursuant to the Carnival

and Amusement Rides Safety Act, ILL.REV.STAT. ch. 111½, paras. 4051–4069.

**15.** The plaintiffs attempt to distinguish *Batteast* on the ground that it applies only to the use of a safety regulation for purposes of instructing the jury as to the standard of care. The opinion, however, clearly refers to the use of regulations as "evidence" of negligence. *Id.* It does not in

Douglas's accident was a terrible trage-dy, and the circumstances surrounding the accident gave the plaintiffs good reason for blaming the defendants. Illinois law, how-ever, at times protects defendants from liability arising from injury to certain classes of people. And that protection at-taches where, as here, the evidence shows that Douglas Roland simply had no busi-ness walking directly underneath the large, dangerous carnival ride that caused his in-jury. The jury was properly instructed, the plaintiffs offer no basis for upsetting the district court's evidentiary rulings, and there is no challenge to the jury's verdict. The judgment of the district court is

AFFIRMED.

any way limit itself in the manner suggested by the plaintiffs.

# APPENDIX A

PLAINTIFF'S
EXHIBIT
NO. 25

SCALE:
0'   6'   12'   18'   24'

N

KEY
– – –  Wood Fence
▬▬▬  Temporary Fence
▬▬▬  Center of Road
▬ ▬ ▬  Spider Fence
✦✦✦  Lawn

CHURCH STREET

DRIVEWAY

SPIDER

LIBRARY

6' WIDE

ZIPPER FLATBED

SIDEWALK

ZIPPER

# APPENDIX B

