FRANCIS HOPKINSON, Adm'r of the Estate of Rita Hopkinson, Deceased, Plaintiff-Appellee, v. CHICAGO TRANSIT AUTHORITY, Defendant-Appellant.

First District (5th Division) No. 1—88—3258

Opinion filed March 28, 1991.

828

William H. Farley, of Chicago Transit Authority, and Arnstein & Lehr, both of Chicago (Arthur L. Klein, Patrick F. Geary, and John T. Wagener, of counsel), for appellant.

Ambrose & Cushing, P.C., of Chicago (Thomas M. Cushing, of counsel), for appellee.

JUSTICE COCCIA delivered the opinion of the court:

Plaintiff Francis Hopkinson, administrator of the estate of Rita Hopkinson, brought this wrongful death action against defendant, the Chicago Transit Authority (CTA), following decedent's rape and murder by an unknown assailant at a CTA "el" train station. A jury awarded plaintiff $1,500,000 in damages, and judgment was entered on the verdict.

On appeal, the CTA contends that it is immune from actions for failure to prevent criminal attacks by third persons, pursuant to a retrospective application of section 27 of the Metropolitan Transit Au-

thority Act (Ill. Rev. Stat. 1985, ch. 111⅔, par. 327); that the CTA owed no duty to decedent to protect her from the criminal attack of third persons; that decedent was not an invitee on CTA premises when first accosted; that plaintiff's expert witness was not qualified to render expert opinions; that evidence of prior criminal incidents was improperly admitted; that an undisclosed witness was improperly permitted to testify as an expert; that the CTA was improperly excluded from arguing to the jury about the lack of prior similar incidents; and that the CTA was improperly barred from introducing evidence of police patrols at the CTA station.

At trial, it was established that on Sunday, May 28, 1978, between 9 a.m. and 9:30 a.m., decedent was raped and stabbed to death at the Austin/Lombard station of the Congress "el" train line which connects Chicago and Oak Park.

The CTA station platform, located below street level, runs between two ticket booth areas which are up·at street level. A passenger may enter at the east end of the station, where an east-west ramp runs down to the platform.

The attack on decedent occurred at the west end of the station, about four blocks away, where a passenger may enter at Lombard Avenue. The Lombard entrance consists of a nearly enclosed ticket booth area, surrounded by metal sheeting and opaque fiberglass. A passenger would enter the ticket booth area through a floor-to-ceiling turnstile with interlocking horizontal steel bars. He would then walk down a three-flight stairway, and then walk through a 200-foot walkway. Finally, he would walk up a few steps to the 500-foot platform itself. It is then necessary to walk the length of the platform to the Austin end, where the trains stop.

The Lombard stairway and walkway are encompassed by opaque corrugated fiberglass paneling approximately four feet tall, and a roof. On the platform itself, there are numerous metal wind partitions, covered with billboards, set in the middle of the platform.

Both the Austin and Lombard ticket booths were not staffed on Sundays, and fares were collected on the train.

The CTA train platform is set below street-level excavation. Starting at the south end of the excavation is a cement retaining wall which runs east-west, and which is built from the ground up to the street. Parallel to the wall are east-west railroad tracks, then the east-west CTA tracks and platform, and then the east-west Eisenhower Expressway.

The 22-year-old, 5-foot-tall, 88-pound decedent left home at about 8:45 a.m., planning to study at the University of Illinois medical

school in Chicago where she was a student. She carried a purse, lunch, books and school papers. Her father dropped her at an Austin Boulevard bus about one mile north of the Congress "el" station. A transfer found in decedent's purse indicated she was on the southbound bus just before 9 a.m.

Diane DeMarro Jelison testified for plaintiff that she was 14 years old on the day in question. Between 8:50 and 9 a.m., Jelison and two friends went through the Lombard Avenue entrance and walked to the east end of the platform. Jelison also testified that from the street you could not see the platform or the Lombard walkway which leads to the platform. Jelison saw several people on the platform, including a black man sitting on a bench. He stared at Jelison in a "weird" way that caused her to be very frightened. Several minutes later, a train arrived, and Jelison and her friends boarded. The man did not board the train. She later described the man to the Oak Park police.

Tom Hejna testified for defendant that sometime after 9 a.m., he was playing baseball in a park, across the street and about 350 feet from the Lombard end of the "el" station. The park was street level, above the expressway and the "el" platform. One end of the park ran parallel with the platform.

Hejna testified that shortly after 9 a.m., while playing centerfield, he saw decedent on Lombard Avenue, outside of the Lombard entrance to the "el" station, with a black man. The man was "leading her by the hand into the station." Decedent appeared "reluctant," but not in danger. Hejna had no idea whether or not they had just exited the Lombard station.

Decedent and the man walked into the station and were in and out of his view after that time. Hejna could see the first flight of the stairway. At one point, he saw decedent run down the stairway, followed by the man, who then led her back up the stairway. Panels obstructed his view, and he could not tell whether she was fully clothed or injured at that time. Hejna could occasionally see them through the rear opening in the Lombard entrance, and at one point saw the girl seated on the ground while the man stood near her.

Hejna eventually saw another man, Kenneth Bobco, enter the station at Lombard Avenue. Hejna then saw Bobco run down the stairs, and after a short delay, decedent ran after Bobco. The assailant then exited the station onto Lombard Avenue. He looked down at the platform, and then ran away.

Hejna was not certain how long this all took, but he remembered playing portions of two half-innings in centerfield, and between those, his team played a full half-inning up at bat.

Kenneth Bobco testified for plaintiff that he entered the station at Lombard Avenue between 9 and 9:30 a.m. He could not see into the area very well until he had actually passed through the turnstile. Bobco then saw decedent, naked from the waist down, standing on the top stair of the stairway leading down to the platform. Decedent pointed to a "completely obscured area around the corner inside that entrance area." A black male then moved from that area toward Bobco and stabbed him twice in the chest. Bobco began running down the stairs and through the walkway to the platform, yelling at decedent to run, too. At one point, Bobco fell. He then turned and saw decedent running behind him on the platform, and noticed she was covered with blood. Bobco finally collapsed on the platform, unconscious.

Bobco later described the assailant to the Oak Park police, and that description matched the one given by Jelison of the man she had seen on the platform at 9 a.m. Bobco also testified that from the street, it was almost impossible to see into the Lombard stairway and walkway.

At about 9:32 a.m., the police arrived. The assailant was never apprehended.

William Thomas, a CTA motorman, testified for both parties. He stated that he drove an eastbound train into the Austin/Lombard station shortly after 9 a.m. Looking up to the street level, he saw a bus stopped at the Austin entrance to the station. He saw several passengers, but did not see the man Jelison described and did not see decedent.

Rafael Davila, a CTA conductor, testified for defendant that he was on a 9:06 a.m. westbound train. He scanned the platform for passengers, and saw several, but did not see the man Jelison described, or decedent. After the train reached the end of the line it turned around. The now eastbound train arrived at the Austin/Lombard station shortly after 9:30 a.m., when he saw a lady lying on the platform, and he radioed for help.

Dr. Michael Wolfson Kaufman, a pathologist, testified for plaintiff that he reviewed the medical examiner's records regarding decedent. Decedent suffered four chest wounds which perforated the surface of the lungs. Any one or more of the wounds could have been fatal. She also suffered a knife wound which penetrated completely through the heart and was a fatal wound. There was also a stab wound in the vaginal area. Ultimately, decedent bled to death. It would have taken anywhere from 5 to 15 minutes to bleed to death, depending on the sequence of the wounds.

Lieutenant Paul Briggs of the Oak Park police department testified for plaintiff that he was called to the scene of the murder on May 28, 1978. Just inside the Lombard entrance he found decedent's purse, shoe, jeans, lunch and school papers. A CTA transfer was found in the purse. He observed a little blood inside the Lombard ticket booth area, and a trail of blood on the stairway and walkway, including footprints, handprints and pools of blood.

Briggs also testified that you could not see into the ticket booth area from the street. He testified that from the baseball field on Garfield, and looking into the Austin or the Lombard entrance, it was not possible to see most of the "el" platform. Standing on either Austin or Lombard Avenue, you could not see the tunnels on the opposite ticket booths because they are partially walled and roofed with opaque paneling.

Michael Fitzsimmons testified that in 1978 he was deputy chief of police for Oak Park. He related a series of extensive complaints, community outcry and studies relating to the serious crimes committed at the Austin/Lombard and Oak Park/East Avenue stations. These meetings included the Oak Park police, CTA security representatives and citizens. At one point, CTA representatives were given a survey showing that in the first five months of 1975, the number of serious crimes committed at these two stations had increased 110%. The Oak Park police recommended to the CTA that the opaque panels obstructing the view of persons in the walkway and stairway be removed; that the Lombard station be closed during slow times; that an alarm system be installed at the stations, linking them to the police station; and that a study be completed. The CTA representatives stated that they would consider the recommendations; however, none of them were ever implemented.

Plaintiff's counsel read into the record letters from congressmen to the CTA regarding the Austin/Lombard station's dangerous conditions, particularly the concealment dangers of the fiberglass walls.

Timothy O'Mahoney testified as an expert witness for plaintiff, over defendant's objections. He opined that the CTA should have known that a serious crime such as the attack on decedent was highly likely to occur, due to prior criminal incidents which had occurred during the past five years on the Austin/Lombard station and the Oak Park/East Avenue station, located a half mile away. O'Mahoney also pointed to the opportunity for concealment due to the design of the Lombard Avenue entrance.

O'Mahoney also opined that the incident could have been prevented by the CTA's use of certain security methods. He suggested a

"no-hide" architecture including the removal of the opaque fiberglass panels, installing closed circuit TV, having a ticket agent on duty, bells to announce an arriving train, public telephones on the platform, closing the Lombard entrance when no agent was on duty, CTA security patrols, public education about transit safety, and encouraging passengers like Jelison to report strange things they saw. None of these security devices were in place at the time of decedent's death.

Lieutenant Robert Hanley of the Chicago police department testified as an expert witness for defendant. He testified that a period of one to three months, rather than five years, should be used to trace criminal activity patterns. "Any farther back than that is vague because the criminal moves from one location to another location." Sometimes they would look back at files for a period of one year, but after that they had to return the files "downtown to put them in the memory bank." Hanley offered the opinion that the Lombard Avenue entrance did not present an unreasonable risk of harm due to areas of concealment because it was fully "open to the public" and, once inside the Lombard turnstile, allowed a "total view of the whole terminal."

He believed, "from the reports that [he] read," that decedent was not accosted on the platform, but instead was walked by the assailant from nearby Flournoy Street into the "el" station, down to the platform where they stayed briefly, and back up the stairs again. If he was mistaken and the reports did not show that decedent had come from Flournoy Street, Hanley would change his opinion about decedent's not being accosted from the platform.

Hanley testified that a closed circuit TV system had been tested on a portion of the CTA transit line and had been found ineffective. Hanley believed the CTA could not have known such a serious crime was likely to occur at this station. Hanley believed that 56 incidents over five years at two stations revealed no discernible pattern of serious crime. The police only considered it a "pattern" requiring action when there was evidence of a "repeater," *i.e.*, numerous crimes committed at the station within a month.

■ The CTA first contends that the trial court erred in refusing to dismiss the action based on the enactment of section 27 of the Metropolitan Transit Authority Act, which provides:

> "Neither the Authority, the members of its Board nor its officers or employees shall be held liable for failure to provide a security or police force or, if a security or police force is provided, for failure to provide adequate police protection or security, failure to prevent the commission of crimes by fellow pas-

sengers or other third persons or for the failure to apprehend criminals." Ill. Rev. Stat. 1985, ch. 111²/₃, par. 327.

Defendant argued at the 1988 trial that the statute should be applied retrospectively to the 1978 attack of decedent.

This court recently held section 27 to be a substantive amendment with a prospective application. (*Young v. Chicago Transit Authority* (1990), 209 Ill. App. 3d 84.) We find nothing in defendant's argument here which would alter our holding in *Young*.

■■ Prospective application of a statute is preferred. (*Maiter v. Chicago Board of Education* (1980), 82 Ill. 2d 373, 390, 415 N.E.2d 1034.) A statutory amendment creates a presumption of intent for prospective application where the change is "substantive" rather than "procedural." (*Rivard v. Chicago Fire Fighters Union, Local No. 2* (1988), 122 Ill. 2d 303, 309, 522 N.E.2d 1195, 1198.) The presumption can be rebutted by either the express language of the Act or by necessary implication drawn from the Act itself. *Rivard v. Chicago Fire Fighters Union, Local No. 2*, 122 Ill. 2d at 309.

■■ A procedural change in law generally prescribes methods of enforcing rights, and embraces pleading, evidence and practice, *i.e.*, legal rules which direct the means to bring parties into court or the manner in which the court process shall proceed. It facilitates suit against a party. In contrast, a substantive change in law establishes, creates, defines or regulates rights, and thus could actually " 'make[ ] one a party to a suit?' " *Rivard*, 122 Ill. 2d at 310-11, quoting *Ogdon v. Gianakos* (1953), 415 Ill. 591, 596, 114 N.E.2d 686.

In *Rivard*, the court held that the law governing whether or not unincorporated associations could be sued was substantive. At common law, injured parties enjoyed no rights against unincorporated associations. The statute at issue in *Rivard* altered this substantive law by establishing the right of unincorporated associations to sue and to be sued.

In *Moshe v. Anchor Organization for Health Maintenance* (1990), 199 Ill. App. 3d 585, 557 N.E.2d 451, this court held that a statutory immunity granted to health plan corporations operated to prevent a cause of action from coming into being and therefore was substantive in nature, as was the subsequent legislation abolishing the immunity. *Moshe*, 199 Ill. App. 3d at 600-01.

■■ Similarly, in the present case, the law governing whether or not the CTA can be sued is substantive. Prior to the enactment of the amendment to section 27 (Ill. Rev. Stat. 1985, ch. 111²/₃, par. 327) in September 1985, the CTA could be sued for injury caused to a passen-

ger by a third person. This was a common law substantive right. After the statute became effective, that substantive right was abolished.

Although we have held that section 27 bars a cause of action and thus is the kind of amendment which requires prospective application, we must go on to ask whether the legislature has indicated an intent to apply the new law retrospectively. See *Board of Education of School District No. 170 v. Illinois State Board of Education* (1984), 122 Ill. App. 3d 471, 479, 461 N.E.2d 567, citing *United States Steel Credit Union v. Knight* (1965), 32 Ill. 2d 138, 204 N.E.2d 4.

■ The express language of section 27 contains no reference to a retrospective intent. We find further that the Act contains no necessary implication or "logical necessity" (*In re Application of County Treasurer* (1973), 14 Ill. App. 3d 1062, 1066, 304 N.E.2d 9, 12) of retrospective application of section 27.

The CTA relies on *State Farm Mutual Auto Insurance Co. v. Palmer* (1984), 123 Ill. App. 3d 674, 463 N.E.2d 129, where the court held that interspousal immunity was a procedural bar because it could be waived, and was not a substantive bar to causes of action between spouses. In *Young v. Chicago Transit Authority*, we rejected this argument because the statutory immunity granted under amended section 27, "in contrast to interspousal immunity, is non-waivable and prevents a cause of action from coming into being." *Young*, 209 Ill. App. 3d at 93. See also *Moshe v. Anchor Organization for Health Maintenance*, 199 Ill. App. 3d at 601, 557 N.E.2d at 461.

■ We note further that if a tortfeasor waives his immunity from liability for injury he caused to his spouse, he must pay any judgment entered against him. In contrast, if the CTA were permitted to waive its immunity from liability for failure to protect passengers from criminal assaults, the cost of compensating injured passengers would be "a burden which would be ultimately borne by taxpayers and fare-paying passengers." *Bilyk v. Chicago Transit Authority* (1988), 125 Ill. 2d 230, 238, 531 N.E.2d 1.

The CTA also argues, as it did in *Young v. Chicago Transit Authority*, that the amendment to section 27 is procedural because it merely affects plaintiff's remedy, since it does not eliminate all causes of action arising from the criminal attack—only the causes of action against the CTA itself. We reject that argument here for the same reasons stated in *Young*, 209 Ill. App. 3d at 92. See also *Moshe v. Anchor Organization for Health Maintenance*, 199 Ill. App. 3d at 600-01, 557 N.E.2d at 460.

The CTA next contends, as it strenuously argued throughout the trial, that plaintiff failed to prove that decedent was an invitee to

whom the CTA owed a duty of protection from the criminal attack of a third party. The CTA argues that the status of decedent was a question to be decided by the jury, not by the court as a matter of law. Thus, it argues that the court erred in refusing to let the jury decide whether the CTA owed decedent a duty of protection.

■ Every litigant has the right to have the jury instructed on his theory of the case, and in order to justify the giving of an instruction, "some evidence" in the record must support the theory. (*Hall v. Northwestern University Medical Clinics* (1987), 152 Ill. App. 3d 716, 724, 504 N.E.2d 781.) However, where all the facts and inferences therefrom lead to only one conclusion, the matter of whether a party is an invitee may be decided without recourse to a jury. *Ellguth v. Blackstone Hotel, Inc.* (1951), 408 Ill. 343, 97 N.E.2d 290 (court affirmed ruling that plaintiff was invitee as matter of law, and jury instruction that plaintiff was invitee did not invade province of jury); *Sumner v. Hebenstreit* (1988), 167 Ill. App. 3d 881, 884-85, 522 N.E.2d 343, 346 (question of whether plaintiff was licensee or trespasser properly determined as a matter of law); *Lorek v. Hollenkamp* (1986), 144 Ill. App. 3d 1100, 1102, 495 N.E.2d 679, 681 (question of whether plaintiff was an invitee or licensee was properly determined as a matter of law); *Fugate v. Sears, Roebuck & Co.* (1973), 12 Ill. App. 3d 656, 672-73, 299 N.E.2d 108, 120-21 (proper to rule that, as a matter of law, plaintiff was a social guest); *Jacobsma v. Goldberg's Fashion Forum* (1973), 14 Ill. App. 3d 710, 711, 303 N.E.2d 226, 228 (court affirmed trial court's determination that, as a matter of law, plaintiff had lost his status as invitee and was volunteer, and thereby properly refused to submit question to jury); *Johnson v. Shell Oil Co.* (1970), 131 Ill. App. 2d 1032, 264 N.E.2d 278 (abstract only) (court affirmed trial court's decision to not submit to jury issue of whether plaintiff was invitee or licensee, notwithstanding that instruction to jury that defendant was under duty of ordinary care was tantamount to express finding that plaintiff was an invitee as a matter of law, which was not error under the evidence). Cf. *Sims v. Chicago Transit Authority* (1955), 7 Ill. App. 2d 21, 129 N.E.2d 23 (reversible error to submit question of carrier and passenger relationship to jury where evidence showed as a matter of law plaintiff ceased to be a passenger and became an invitee to whom defendant owed only the duty of ordinary care).

■ Generally, the question of whether the parties stood in such a relationship to each other that the law imposed on defendant a duty of reasonable care for plaintiff's safety is a question of law for determination by the court. *Figueroa v. Evangelical Covenant Church* (7th

Cir. 1989), 879 F.2d 1427, 1431, citing *Ferentchak v. Village of Frankfort* (1985), 105 Ill. 2d 474, 480, 475 N.E.2d 822, 825; *Cunis v. Brennan* (1974), 56 Ill. 2d 372, 375, 308 N.E.2d 617, 618-19.

A duty to protect one against the criminal attacks of third persons exists only where a special relationship exists between the actor whose negligent conduct creates the risk and the person suffering the harm. (*Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 556, 328 N.E.2d 538.) One such special relationship is that of a common carrier-passenger. *Rowe v. State Bank* (1988), 125 Ill. 2d 203, 215-16, 531 N.E.2d 1358, 1364; *Gordon v. Chicago Transit Authority* (1984), 128 Ill. App. 3d 493, 470 N.E.2d 1163.

If decedent were considered a "passenger," the CTA would be bound to exercise the highest degree of care and prevent injuries which it reasonably could have foreseen and avoided. (*McCoy v. Chicago Transit Authority* (1977), 69 Ill. 2d 280, 285, 371 N.E.2d 625.) The trial court here determined as a matter of law that decedent was not a "passenger" and that finding is not disputed on appeal.

As an invitee present on the CTA's platform or property, but not on its train, the CTA is required to exercise only ordinary care to keep the property in a reasonably safe condition for use. (*Neering v. Illinois Central R.R. Co.* (1943), 383 Ill. 366, 374, 50 N.E.2d 497, 501.) The trial court here found that as a matter of law decedent was an invitee.

> "Counsel, I am ruling as a matter of law that she is an invitee * * *.

> * * *

> She was in my opinion, under the evidence, under the circumstances such that she was entering upon the premises for a purpose consistent with the purpose of the operator of the train. She came there basically to get upon the train. Now, that's the ruling of the Court. It will not be submitted. She was an invitee."

The test for whether or not someone is an invitee is: (1) if he enters the premises of another by express or implied invitation; (2) his entry is connected with the owner's business or with an activity the owner conducts or permits to be conducted on his land; and (3) there is a mutuality of benefit or a benefit to the owner. *Figueroa v. Evangelical Covenant Church*, 879 F.2d 1427, citing *Grimwood v. Tabor Grain Co.* (1985), 130 Ill. App. 3d 708, 710, 474 N.E.2d 920, 922.

There is little question that a person entering a station platform to catch a train is entering by invitation and that there is a benefit to the owner. The CTA, in practical effect, focuses its arguments

on the second part of the three-part test, *i.e.*, whether decedent's *entry* was connected with the CTA's business. The CTA contends that the focus must be on the time decedent was *first accosted* by the assailant. It argues there is "substantial evidence which logically supports an inference that [decedent] was not on defendant's premises at the time she was first accosted."

We believe the CTA's attempt to split the attack into fragmented bits of time results in an artificial and unreasonable view of the evidence before the jury. The evidence and any reasonable inferences drawn therefrom establish that decedent physically entered the CTA station at Austin and was then accosted by the assailant.

Shortly before 9 a.m., decedent's father dropped her at the Austin Boulevard bus station. The transfer found in decedent's purse indicated she was on the bus at 9 a.m. She planned to transfer to the Congress "el" and take the train to school. The jury could only reasonably infer that, because she was found at this "el" stop, she did in fact exit the bus at the Congress station.

The Austin bus stops right outside the door to the Austin Boulevard Congress "el" station. Decedent would need to walk three or four steps from the bus to enter the "el" station door. For the assailant to accost decedent at this point would mean he would have to grab her almost as she stepped off the bus, on this seven-lane street in broad daylight, with no other buildings nearby on this overpass crossing the expressway, and somehow steer her from the door which was only a few steps away. Such an inference cannot reasonably be drawn from the evidence.

In addition, the assailant was seen on the platform shortly after 9 a.m. by Jelison, and the same man was described by Bobco as the assailant.

Moreover, when decedent was seen by Hejna outside of the Lombard Avenue entrance, she carried no purse, books or papers, all of which she carried when her father left her at the bus stop, and all of which were found lying *inside* the Lombard Avenue entrance. The only possible reasonable inference to be drawn from the evidence is that prior to being seen outside the Lombard entrance with the assailant, decedent had been accosted by him *inside* the "el" station.

There is no evidence in the record to support a reasonable inference that decedent would exit the Austin bus, ignore the door to the Austin "el" station entrance four steps away, although that entrance is always open, and walk the four blocks around the expressway where there was not even a sidewalk, over to the Lombard Avenue entrance, which was often locked on weekends.

The CTA argues, however, that even if decedent attained an invitee status, she lost that status when she and the assailant exited the station at Lombard and returned for the opportunity to use the ticket booth area for the rape and stabbing, conduct not connected to the CTA's business. We also reject this theory.

In *Neering v. Illinois Central R.R. Co.*, a woman entered the train station platform at the far end, walked all the way to the station warming house at the other end of the platform and sat on a bench, and was then accosted by a man. She ran out the door and down the platform. The man chased her, knocked her off the platform, jumped down, and pulled her under the platform, where he raped and beat her.

The victim's physical movement off the station platform never entered the court's analysis of whether she was an invitee, although it specified that a duty to exercise ordinary care applied only to "station buildings and other appurtenances" such as platforms. *Neering*, 383 Ill. at 374, 50 N.E.2d at 501. See also *Figueroa v. Evangelical Covenant Church*, 879 F.2d 1427 (plaintiff abducted from parking lot, and later raped and stabbed; emphasis is on place of abduction, not departure from defendant's property); *Small v. McKennan Hospital* (S.D. 1989), 437 N.W.2d 194 (victim was invitee of hospital, as a matter of law, where she was abducted from parking ramp, taken elsewhere and killed); *Jardel Co. v. Hughes* (Del. 1987), 523 A.2d 518 (victim was business invitee of shopping mall owner where she was abducted from mall parking lot, taken to a remote site adjacent to the mall, beaten and raped).

In *Rotheli v. Chicago Transit Authority* (1955), 7 Ill. 2d 172, 176-77, 130 N.E.2d 172, the court rejected the type of fine-line factual distinctions the CTA tries to make here. In *Rotheli*, the court criticized its earlier opinion in *Feldman v. Chicago Rys. Co.* (1919), 289 Ill. 25, 124 N.E. 334, where the court made a distinction between two passengers who were injured after exiting a bus. The court distinguished them on the basis that one had finished his journey and one intended to transfer to another bus. In *Feldman*, the court held the duty owed by the carrier to each person was different, that a higher degree of care was owed to the transferring passenger. In *Rotheli*, the court explained its criticism:

> "The ends of justice are not served by constructing theories to support a former decision by fine-line factual distinctions where a disturbing element continually provokes in the judicial mind a doubt that substantial justice has been done. To pronounce that two passengers, both injured after alighting from a

common carrier, are viewed differently by the law merely because one intends to transfer to another conveyance of the same carrier while the other does not is an unwitting creation of a condition of basic injustice." *Rotheli,* 7 Ill. 2d at 176-77, 130 N.E.2d at 172.

 The same reasoning applies in the present case. The CTA's argument that decedent lost her status as invitee when she was forced out of the Lombard entrance and back in again creates an artificial line which is unjust and ignores the realities of the entire circumstances surrounding this brutal crime. A person does not arbitrarily pass from one status to another based upon mere suspicions, and the court must view all of the surrounding facts and circumstances in determining the person's status. See *Ellguth v. Blackstone Hotel, Inc.,* 408 Ill. 343.

See also *Nixon v. Mr. Property Management Co.* (Tex. 1985), 690 S.W.2d 546, where the majority court found a 10-year-old rape victim who had been forced into an adjacent building was owed a duty by the property owner under an ordinance. The court filed four separate opinions discussing her status as invitee. One concurring opinion noted the lower court's "groping for a designation for a ten year old girl who has been forcibly dragged off the street into an apartment complex." The opinion referred to these "duty fictions." (*Nixon,* 690 S.W.2d at 551-52 (Kilgarlin, J., concurring).) Another opinion noted that it would "be manifestly unjust to classify her as trespasser when she was dragged onto the property by a rapist." Instead, the court must view "all the circumstances." *Nixon,* 690 S.W.2d at 554 (Spears, J., concurring).

In the case before us, we conclude that the trial court correctly held that the only possible reasonable inference supported by the evidence was that decedent entered the Austin entrance to the "el" station and was accosted by the assailant within the station.

In a related argument, the CTA argues that the trial court erred in refusing to direct a verdict for defendant and in denying defendant's motion for a judgment notwithstanding the verdict.

 A directed verdict or judgment notwithstanding the verdict should be granted only where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) Here, for the reasons stated above, we find that when all of the evidence of the issue of decedent's status as an invitee is viewed in an aspect most favorable to plaintiff, it does not

so overwhelmingly favor the CTA that no contrary verdict based on that evidence could ever stand.

The CTA next contends that the trial court abused its discretion in permitting O'Mahoney to testify as an expert witness. The qualification of an expert witness rests largely in the sound discretion of the trial court, and its determination will not be reversed absent a gross abuse of discretion. (*Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 302 N.E.2d 257.) A witness may be qualified as an expert based on knowledge, skill, experience, training or education. (*Duffy v. Midlothian Country Club* (1985), 135 Ill. App. 3d 429, 481 N.E.2d 1037.) The witness must possess knowledge of a specialized nature beyond that of the average person on a factual matter material to the litigation. 134 Ill. 2d R. 220. See, *e.g., Gordon v. Chicago Transit Authority*, 128 Ill. App. 3d 493 (court rejects CTA's argument that O'Mahoney was not a public transit security expert), cited in M. Graham, Cleary & Graham's *Handbook of Illinois Evidence* §702.2, at 497 (5th ed. 1990); see also *Young v. Chicago Transit Authority*, 209 Ill. App. 3d at 95 (court rejects CTA's argument that O'Mahoney was not a public transit security expert, finding argument was waived).

O'Mahoney received training and experience as a military policeman; as an army reservist; as a CTA security officer; as a special officer with the Milwaukee Railroad in commuter rail stations; and as security supervisor in Water Tower Place in Chicago. He has attended numerous courses in law enforcement. Among other things, O'Mahoney participated in meetings with the CTA, between 1978 and 1981, regarding transit security problems and solutions. He has also made on-site security inspections of commuter transit lines in six major cities.

Certainly this training and experience resulted in his possession of knowledge of a specialized nature beyond that of the average person. (See 134 Ill. 2d R. 220.) Furthermore, defense counsel was permitted to explore these qualifications on cross-examination before the jury. We find no abuse of discretion in qualifying O'Mahoney as an expert in rapid transit security.

The CTA next contends that the trial court erred in allowing O'Mahoney to render his opinion on causation between decedent's attack and the CTA's failure to provide safe premises. Specifically, the CTA complains that O'Mahoney "conceded that the devices would not have prevented the assault if the decedent was not initially confronted by her assailant on the platform," and that O'Mahoney "was aware of no evidence demonstrating that she was first accosted there." The CTA concludes that O'Mahoney's opinions regarding the CTA's "alleged negligence would have no relevance without this illusionary

foundation, because the alleged negligent acts would otherwise have no causal relationship to her death."

As the CTA itself recites, the rule is that an expert may base an opinion on assumptions, if they are supported by facts or reasonable inferences from the facts. (*Smith's Transfer Corp. v. Industrial Comm'n* (1979), 76 Ill. 2d 338, 350, 392 N.E.2d 14.) We have already held that the only reasonable inference which could be drawn from the evidence was that decedent was first accosted on the CTA premises. Moreover, defense counsel thoroughly explored the possibility of decedent's being accosted outside the station when it cross-examined O'Mahoney.

The CTA's reliance on *Shaner v. Tucson Airport Authority, Inc.* (1977), 117 Ariz. 444, 448, 573 P.2d 518, 522, is misplaced. In *Shaner*, no evidence was presented at trial. The court granted defendant's motion for a directed verdict following plaintiff's opening statement. Moreover, the opening statement showed that there was no evidence of what occurred in the parking lot from which the murder victim was abducted. In contrast, here, the brutal rape and murder all occurred on the CTA's premises. In addition, we disagree with the *Shaner* court's holding that plaintiff's security expert, who would testify that the poor lighting and inadequate security were a proximate cause of the kidnapping and death, is not the proper subject of expert testimony since it required no special knowledge and would have been of no aid to the jury. (*Shaner*, 117 Ariz. at 448, 573 P.2d at 522.) We find *Shaner* of no value in our decision here.

The CTA next contends it was prejudiced by the improper admission of evidence of certain prior criminal incidents. It asserts that the "cornerstone of [O'Mahoney's] opinion was a list of 56 criminal incidents which occurred between 1973 and 1978 at the Austin/Lombard station and at Oak Park/East, another station located approximately one-half mile away."

Initially, we note that O'Mahoney based his decision on much more than the prior criminal incidents. The CTA, however, objects to the time span of five years, to the inclusion of the Oak Park/East "el" station, and to the inclusion of crimes involving only vandalism or property damage, contending that this evidence was insufficient as a matter of law to prove notice or reasonable foreseeability.

In order to prove the CTA's liability for negligence, plaintiff was required to establish that the CTA had notice of the existence of a dangerous condition at its Austin/Lombard station platform at the time of decedent's injury. *Miller v. Chicago Transit Authority* (1966), 78 Ill. App. 2d 375, 223 N.E.2d 323.

 The trial court's judgment in regard to the admission or exclusion of evidence will not be disturbed absent a clear abuse of discretion. (*Veer v. Hagemann* (1929), 334 Ill. 23, 28, 165 N.E. 175.) Moreover, in regard to the jury's finding that the attack was foreseeable based on the notice the CTA had of the conditions at the station, we note that a jury verdict will not be disturbed unless it is palpably erroneous, the opposite verdict is clearly compelled, or findings appear to be unreasonable, arbitrary and not based on the evidence. *Friedland v. Allis Chalmers Co. of Canada* (1987), 159 Ill. App. 3d 1, 511 N.E.2d 1199.

 An expert may base his opinion on facts and data not in evidence. The burden is on the opponent to explore this foundation on cross-examination. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.) Prior to O'Mahoney testifying before the jury, the court held an extensive *in camera* hearing to determine exactly which types of crimes O'Mahoney could rely upon as a basis for his opinion regarding notice to the CTA.

In regard to the use of a five-year time period, O'Mahoney testified that he relied on the Mandex Corporation's study of transit crime problems. The study recommended examining a five-year period for a trend analysis. O'Mahoney testified that experts in the field would rely on such a time period. "Longer periods of time are useful for purposes of very detailed studies ***." O'Mahoney also testified that physical changes were made to the Austin/Lombard station in 1976, 2½ years before the murder, and that for an accurate comparison he would go back an equal amount of time before the change as a balance in analyzing any significant effect the physical changes had on the crime pattern. It was on this basis that the trial court permitted him to testify about crimes occurring in a five-year period. We find no abuse of discretion.

In regard to the use of both the Austin/Lombard and the Oak Park/East Avenue stations, O'Mahoney testified that they had nearly identical architectural designs and were only one-half mile apart. In addition, the security factors were similar, the hours of the ticket booth operation were similar, and the neighborhoods were similar. The court properly restricted the comparison testimony to these two stations. (See *Haynes v. Chicago Transit Authority* (1978), 59 Ill. App. 3d 997, 376 N.E.2d 680 (court found criminal conduct on one "el" station was relevant to subsequent attack of passenger on adjacent "el" station).) Notably, of the 56 incidents considered at these two stations, only 12 were at the Oak Park station, and eight of those were property damage cases.

In regard to the types of crimes considered, following the *in camera* hearing, the court ruled that only certain types of crimes could be considered, including certain criminal damage cases. Other incidents, such as those occurring on the train, which then happened to result in an arrest at the Austin/Lombard station, could not be included. See *Gordon v. Chicago Transit Authority*, 128 Ill. App. 3d 493 (O'Mahoney considered crimes against both person and property).

O'Mahoney testified that he relied on a Carnegie Melon report where researchers considered lesser crimes because it indicated a crime atmosphere or the openness of crime in a particular area. He testified that experts in the field would normally rely on reports of such incidents. Moreover, vandalism to the station property was a highly visible crime which could act as "an advertisement that crime can be committed here and in the sense it's significant \*\*\* then types of crime will go beyond just damage to property." We agree with the reasoning stated by the court in *Jardel Co. v. Hughes* (523 A.2d at 525):

> "Jardel's proposed foreseeability standard—limited to specific crimes—is unrealistic. Criminal activity is not easily compartmentalized. So-called 'property crimes,' such as shoplifting, may turn violent if a chase ensues and, as the evidence in this case indicates, family quarrels may become violent with the risk that deadly weapons may be used. Moreover, the repetition of criminal activity, regardless of its mix, may be sufficient to place the property owners on notice of the likelihood that personal injury, not merely property loss, will result." *Jardel*, 523 A.2d at 525, citing *Foster v. Winston-Salem Joint Venture* (1981), 303 N.C. 636, 641-42, 281 S.E.2d 36, 40; *Murphy v. Penn Fruit Co.* (1980), 274 Pa. Super. 427, 418 A.2d 480; *Nallan v. Helmsley-Spear, Inc.* (1980), 50 N.Y.2d 507, 429 N.Y.S.2d 606, 407 N.E.2d 451.

 Significantly, on cross-examination it was repeatedly brought out that the prior criminal incidents considered by O'Mahoney included various types of crime. For example, at the Austin entrance to the station, there were four batteries, 11 robberies, and one sexual assault. In contrast, at the Lombard end of the station there were six sexual assaults, and five "other" crimes, including two to four property damage incidents. Even having put the types of crimes in this perspective, the jury could find it highly probative to the issue of notice to the CTA of a dangerous condition that six sexual assaults occurred on the Lombard side of the station.

We find it was well within the discretion of the trial court to impose the limitations it did on the evidence of prior similar incidents. The jury could weigh this testimony and the weaknesses brought out in cross-examination, along with the testimony of defendant's expert witness.

The CTA's reliance on *Miller v. Chicago Transit Authority* is misplaced. In *Miller v. Chicago Transit Authority*, the court found an offer of proof of incidents occurring half mile from the Monroe Street platform where the surroundings are very different, four to eight years prior to the assault at issue, to be too remote in both time and place. That offer of proof, however, was overall found to be too vague, and the court was quite critical of the informal nature of the offer of proof. The offer of proof merely stated that several officers would testify " 'that there were several complaints received over a period of time prior to 11/25/56 as to assaults, robberies and various crimes in and about the platforms in the area of the subway near Monroe and State Street.' " (*Miller*, 78 Ill. App. 2d at 379.) The evidence here is far more detailed than the *Miller* offer of proof's vague reference to "several complaints" which occurred "over a period of time" and "in the area of the [Monroe/State Street] subway," in regard to "various crimes."

The CTA next contends that Lt. Briggs should not have been permitted to offer expert testimony. The CTA specifically points to Briggs' testimony regarding the cause of decedent's wounds, and the pattern of blood at the scene, showing decedent was repeatedly attacked, "in direct contradiction to the eyewitness testimony."

█ A lay witness may offer an opinion if it is helpful to a clear understanding of his testimony or a determination of a fact in issue. (*Freeding-Skokie Roll-Off Service, Inc. v. Hamilton* (1985), 108 Ill. 2d 217, 483 N.E.2d 524, citing Federal Rule of Evidence 701(b).) There must be a proper foundation establishing the witness' personal knowledge of facts that form the basis of his opinion. (*People v. Robinson* (1981), 102 Ill. App. 3d 884, 429 N.E.2d 1356.) "The opinion of the [lay] witness must also be rationally based on the witness's perception, meaning only that it must be one that a person could normally form from observed facts." M. Graham, Cleary & Graham's Handbook of Illinois Evidence §701.1, at 482-83 (5th ed. 1990).

█ Briggs testified that he believed a superficial wound across the bridge of decedent's nose showed a pattern which matched the gold chain around her neck. "It was my opinion that the wound on her nose was caused by this chain." There was a proper foundation, as the police officer merely noted the same pattern on the necklace

and on the wound on decedent's nose. The opinion was rationally based on the officer's perception. We find no error here, particularly in light of the fact that whether or not the necklace made a superficial wound on decedent's nose is far removed from the ultimate issue in this case.

Briggs testified on direct examination, without objection from defendant, that there was a little blood in the ticket booth area, a trail of blood on the stairway and walkway, and more blood on the platform. Asked the significance of the various areas of bloody droplets, pools, footprints and handprints, Briggs testified without objection that decedent appeared to have fled from the Lombard ticket booth and ran toward Austin, and had dropped to her knees several times.

"Q. And you get that from the indications from the handprints on the wall?

A. Handprints on the wall, footprints, pools, droplets, indicating running, pools indicating stopped, footprints indicating running again. Handprints from ground level to those—they found smearing up as if to get up and to start, and droplets again until the next pool.

\* \* \*

\*\*\* [I]f you follow the blood pattern, stopped here indicating to us that she had once more gone down, possibly attacked again here (indicating) and finally came to rest again, footprints, bloodprints, came to rest."

On cross-examination, Briggs was asked several questions about the conclusions he had reached from the appearance of the blood trail. For example:

"Q. If you're just speaking now of the appearance of the pools of blood then that would not be sufficient for you to draw the conclusion that she was being attacked throughout the length of her attempt to escape?

A. Yes, it would bring me to that conclusion. However, I would have my opinion reinforced later through other facts.

Q. Would the location of the pools of blood and the handprints on the wall also or instead indicate to you that perhaps she had just fallen down at that point and picked herself back up?

A. No.

Q. That would not be a sufficient explanation for the pools of blood and the handprints?

A. No."

On redirect, Briggs was asked to clarify what he considered in determining decedent was not attacked just in the ticket booth area, but also in the tunnel area. Briggs specified that he considered the number and types of fatal or near-fatal wounds. "She could not have survived for the entire length of flight as described on those drawings."

■■■ Defendant then offered his first objection on this subject. Defendant limited the objection, however, to the ground that there was no foundation for a police officer's giving a medical opinion as to whether or not the wounds were fatal and whether or not she could not have survived them. Defense counsel argued:

"He's not a doctor. And as far as the possibility that I opened this up, I thought I was very careful to limit my questions just to the pool of blood that he saw and the handprints."

The court ruled that Briggs' statement was not a medical conclusion. The CTA waived this issue by failing to specifically object to Briggs' testimony that the pattern of blood found at the scene indicated she was repeatedly attacked between the Lombard entrance and the platform. To preserve an issue for appellate review, a party must make an objection stating specific grounds, and other grounds not stated are waived on appeal. *Akers v. Atchison, Topeka & Santa Fe Ry. Co.* (1989), 187 Ill. App. 3d 950, 543 N.E.2d 939; *Kelleher v. Toledo, Peoria & Western R.R. Co.* (1970), 129 Ill. App. 2d 110, 262 N.E.2d 744.

■■■ Moreover, the CTA must show that an error, if any, resulted in prejudice. (*City of Chicago v. Westphalen* (1981), 93 Ill. App. 3d 1110, 418 N.E.2d 63.) If in fact an error was made, we see no prejudice requiring reversal here. Notably, the pathologist testified that the five chest wounds included a wound which went straight through the heart, and wounds which perforated the lungs. He stated that any one of the wounds might have been fatal. He opined that decedent bled to death within the first 5 to 15 minutes, depending on which wound was inflicted first. An error in the admission of opinion testimony of lay witnesses is not reversible error where it is superfluous testimony. (*Freeding-Skokie Roll-Off Service, Inc. v. Hamilton*, 108 Ill. 2d 217, 483 N.E.2d 524.) Thus, the issue of the fatal nature of the wounds was admissible through this expert, and any comment by Briggs was cumulative.

In addition, defendant cannot complain now where it brought out this particular aspect of the line of questioning on cross-examination, thereby permitting plaintiff to clarify further on redirect examination. See *Sny Island Levee Drainage District v. Meyer* (1963), 27 Ill. 2d 530, 190 N.E.2d 356.

Furthermore, the error, if any, does not materially affect the outcome of the trial, and thus does not require reversal. (See *Ford v. City of Chicago* (1985), 132 Ill. App. 3d 408, 476 N.E.2d 1232.) Whether or not decedent was stabbed both in the ticket booth area and in the adjacent stairway or pathway was not a material issue at trial. See *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 499 N.E.2d 1373.

The CTA next contends that the trial court erred in excluding certain argument. An *in limine* order limited the admission of prior incidents of criminal conduct "to the issue of notice to the CTA" and such evidence could "not [be] offered or argued to show that danger did not exist on the Austin/Lombard 'L' platform in question in this case." We agree with the trial court that there was no error since the CTA argued extensively that it had no notice of danger to its passengers; conducted thorough cross-examination on the issue; and offered expert testimony regarding the significance of prior criminal acts or lack thereof. The cases relied upon by the CTA are strict liability actions, where the evidence of the absence of prior accidents involving the same or similar products is admissible. See *Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 40, 541 N.E.2d 643.

■ In any event, arguing the absence of similar crimes has a limited value, since "it is clear that a long history of good fortune does not relieve a party from exercising ordinary and reasonable care in the operation of his particular business enterprise. Once the negligence conduct produces a foreseeable risk or injury, the actor may not find refuge in a 'long history of good fortune.' " *Small v. McKennan Hospital*, 437 N.W.2d at 201, quoting *Tanguma v. Yakima County* (1977), 18 Wash. App. 555, 569 P.2d 1225; *Butler v. L. Sonneborn Sons, Inc.* (2d Cir. 1961), 296 F.2d 623.

The CTA next complains that prior to trial the court also granted plaintiff's motion to bar evidence of any activity of the Oak Park police department's patrolling the Austin/Lombard "el" station. Plaintiff grounded her motion on the fact that the CTA has a nondelegable duty of care towards its passengers. *Gordon v. Chicago Transit Authority*, 128 Ill. App. 3d 493.

■ The CTA has waived this alleged error by its failure to make an offer of proof of the excluded evidence at trial. (See *Miller v. Chicago Transit Authority*, 128 Ill. App. 3d 493.) An offer of proof enables the reviewing court to determine whether the exclusion was erroneous and harmful, as it discloses the nature of the offered

evidence. *Wright v. Stokes* (1988), 167 Ill. App. 3d 887, 522 N.E.2d 308.

Moreover, we note that the CTA argues that the excluded evidence of the Oak Park patrols was relevant because of plaintiff's claim that the station was "isolated." Lieutenant Briggs testified, however, that from the street it was very difficult to see the platform, and almost impossible to see into the ticket booth area, down the stairway or into the walkway leading to the platform. Other witnesses testified similarly. The CTA might be referring to some type of patrol where the officer would exit the patrol car and walk through the station itself. If so, that merely highlights the importance of including an offer of proof so that a reviewing court might better consider any alleged error. The exact nature of the excluded evidence is not readily apparent to this court, absent an offer of proof.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

LORENZ, P.J., and GORDON, J., concur.